THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MICHAEL TILLMAN, Defendant-Appellant.

First District (3rd Division)   No. 1—88—0737

Opinion filed December 27, 1991.—Rehearing denied March 30, 1992.

Blair, Russell & Cole, of Chicago (Chester L. Blair, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Maureen A. Harton, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE CERDA delivered the opinion of the court:

After a bench trial, defendant, Michael Tillman, was convicted of murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(1)), aggravated criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, par. 12—14(a)(2)), and aggravated kidnapping (Ill. Rev. Stat. 1985, ch. 38, par. 10—2(a)(3)). He was sentenced to natural life in prison for the murder, 30 years' imprisonment for the aggravated criminal sexual assault, and 15 years' imprisonment for the aggravated kidnapping. Defendant argues on appeal that (1) the trial court erred in refusing to suppress his involuntary statement prior to 9 p.m. on July 22, 1986; (2) he was denied effective assistance of counsel; and (3) there was insufficient evidence to prove him guilty beyond a reasonable doubt.

Defendant Michael Tillman was charged with murder, aggravated kidnapping, aggravated criminal sexual assault, residential burglary, and armed violence stemming from the July 20-21, 1986, death of Betty Howard. Codefendants Steven Bell and Clarence Trotter were similarly charged. Trotter's case was severed before the hearing on the motions to suppress statements by Tillman and Bell. The trial

court ruled that any statements made by Tillman after 9 p.m. on July 22, 1986, would be suppressed. The trial court then heard the simultaneous, but severed, trials of Tillman and Bell. At the close of the State's case, the trial court entered a directed finding of not guilty for both defendants on the residential burglary charges.

At the close of the trial, defendant Tillman was found guilty of murder, aggravated criminal sexual assault, and aggravated kidnapping. Codefendant Bell was acquitted of all charges. Defendant was allowed a substitution of attorneys for the post-trial motions and sentencing. The trial court found that defendant qualified for the death penalty, but that sufficient mitigating factors existed to preclude its imposition. Defendant was sentenced to a term of natural life imprisonment for the murder, 15 years' imprisonment for the aggravated kidnapping, and 30 years' imprisonment for the aggravated criminal sexual assault.

On Saturday, July 19, 1986, at about 7:15 p.m., the victim, Betty Howard, left Betty Woods' home, stating that she was going home and would return later that evening. She did not return. The next day, Ms. Howard did not pick up Ms. Woods at 9 a.m. for a picnic, as planned. When Ms. Howard did not arrive, Ms. Woods phoned her home, but there was no answer. At noon, Ms. Woods called again, but the line was busy. At 12:10 p.m., Ms. Woods called a third time, and an unfamiliar man's voice answered the phone. When Ms. Woods asked for Ms. Howard, the man stated that she had already left for the picnic. Ms. Howard, however, never arrived at the picnic.

When Ms. Howard's adult son, Eddie Howard, Jr., heard that his mother had not shown up, he went to her apartment to investigate. When he arrived at her building around 5 p.m., he noticed that his mother's car was not in the parking lot. To enter the building, Eddie rang defendant's bell. Defendant, who was the building's janitor, buzzed Eddie in. Eddie then let himself into his mother's apartment with his own key, but found no one at home. The contents of Ms. Howard's purse were dumped on the couch, her stereo and television were missing, and the bedroom dresser drawers were pulled out. Eddie went downstairs, got his girl friend, and returned to his mother's apartment on the fifth floor. Defendant was also in the elevator, but he continued going up after Eddie and his girl friend left the elevator. Eddie called the police, who classified the call as a missing person.

Shortly afterwards, Eddie's sister, Angelita Howard, and his aunt, Darron Alexander, arrived at the apartment. Two other family members and several police officers also arrived. Eddie and Angelita went outside the building and asked around about their mother. Three sets

of police officers came to the apartment. At 1:15 a.m. on July 21, 1986, Detectives Ronald Boffo and Peter Dignan arrived at the scene. Around 2 a.m., Angelita and Darron started to leave. When they were on the first floor, they saw defendant, who told them that he and his girl friend saw and heard something on the seventh floor. He wanted them to accompany him up to the seventh floor, and stated that he did not know what he saw or heard. Defendant, Angelita, and Darron went into the elevator. Angelita pressed the button for the fifth floor, where she got out to get the police.

Darron testified that while she was waiting, she asked defendant what he had seen. He told her that he had "seen something with his hands tied up like this." On cross-examination, Darron stated that she never told the police what defendant said, and told an assistant State's Attorney for the first time two weeks before the trial. At that point, the police and Angelita entered the elevator, and they all went up to the seventh floor.

When they got off the elevator, defendant pointed out apartment 7C, and the police opened the unlocked door. The apartment was dark and vacant. Defendant and family members followed the police officers into the apartment. Detective Boffo flashed his flashlight into the left bedroom and saw Ms. Howard's body. Defendant then said, "Eddie, that's your mother" or words to that effect.

Searching the rest of the apartment, the detectives found Ms. Howard's two-year-old son in the bathroom, where the door was closed. The baby, who was apparently unharmed, was taken out and given to the family.

Evidence technicians processed the crime scene. Ms. Howard, who was 42 years old, was lying on her back, naked from the waist down, with her legs spread apart. Her wrists were tied to a radiator with yellow ligatures. She was gagged and a piece of towel was stuffed into her mouth. A blouse was partially wrapped around one of her arms, her tube-top blouse was pushed up above her breasts, and a towel, which was blood soaked, was wrapped around her breasts. Ms. Howard had been beaten on her face and body. She was bleeding from her head, neck, and chest. The wounds appeared to be from a knife or other sharp object. The body was removed and taken to the morgue.

On July 22, 1986, Dr. Joanne Richmond performed an autopsy, which revealed a gunshot wound to the left temple, three stab wounds to the right side of the neck and right upper chest, and a stab wound to the left chest. The gunshot wound, which was not a contact wound, indicated that the victim was shot at close range. The bullet went through the brain and was lodged in the right side of the brain. The

cause of death was both the gunshot wound and the left chest stab wound, which penetrated her heart. Because the body had begun to decompose, Dr. Richmond could not ascertain the time of death, although her report stated that death occurred on July 21, 1986.

The detectives questioned defendant in his apartment around 4:15 a.m. on July 21, 1986. At 6:30 a.m., the detectives asked defendant and his live-in girl friend, Princess Williams, to come to the Area 2 police station to answer questions. They complied. Defendant remained in the police station until July 25, 1986, when he appeared before a judge for a preliminary hearing. Statements and admissions which occurred at the police station were the subject of a motion to suppress statements.

Initially, defendant denied any involvement in the murder and cooperated with the police. During the motion to suppress hearing, defendant testified that he went voluntarily to the police station on the morning of July 21, 1986, and was initially questioned for 20 to 25 minutes. At that time, he was not handcuffed and had not received any *Miranda* warnings. During the morning, an evidence technician collected defendant's sweat pants, underwear, and pubic hair samples. According to defendant, he was then fingerprinted and handcuffed to the wall by Detectives Boffo and Dignan. At that time, defendant asked for a phone call, but was refused. Defendant further testified that he was questioned by Officer Wilson, who did not allow him to make a phone call.

Defendant stated that Boffo struck him across the right side of his head with his hand. Later that night, Detective Jack Hines hit him in the face with a phone book, causing a nosebleed. Hines asked him numerous times "who killed the woman" then hit him with his fist, handcuffed his hands in back, and punched him in the stomach. Defendant stated that he threw up blood on his pants and fell to his knees. Defendant was then taken to the bathroom to get paper towels to clean up the floor. Defendant stated that he does not have a problem with nosebleeds and did not tell the police that he did. Defendant then agreed to take a polygraph test.

At the polygraph, which began around 9:20 p.m. on July 21, 1986, defendant testified that he told the polygraph examiner that he had slept the night before and that he was not on medication. He signed a consent form for the polygraph test. He also stated that Hines was present during the polygraph and that two tests were taken, although he was not removed from the machine between the two tests.

Defendant testified that on the way back to Area 2, he was taken to the railroad tracks behind the police station, where Hines put a

gun to his head and threatened to kill him. According to defendant, about 10 minutes after they returned to Area 2, Hines told him that he was a liar and hit him, with laced fingers, on the back of his head.

Defendant stated that he then fell asleep. When he awoke, Boffo kicked him in the leg, then Detectives Boffo, Dignan, Hines, and John Yucaitis questioned him further. Defendant stated that Hines and Boffo held his arms while Yucaitis squirted 7-Up up his nose. Yucaitis then put his thumbs on each ear and pushed in, and placed a gray plastic bag over his head. Defendant stated that his hands were cuffed behind his back during the interrogation. Then, defendant, Yucaitis, Dignan, and Boffo went to 102d and Bensley Streets in Chicago to look in garages for Ms. Howard's car, and to the crime scene to look in garbage cans for the cord used to tie Ms. Howard's wrists to the radiator.

Defendant further testified that when he returned to Area 2, he went to both Bell and his brother, Kenneth, and said, "I told them the truth." The next evening, defendant saw Assistant State's Attorney Frenzer, who threatened him with a deadly injection.

Detectives Boffo and Dignan testified that they did not abuse defendant in any way. They both testified that at 7:30 a.m. on July 21, 1986, they questioned defendant, who was not handcuffed, for 20 minutes. Defendant was given his *Miranda* warnings during the morning of July 21, 1986, and defendant offered to take a polygraph to clear his name. Boffo also stated that defendant was given food and water, did not ask for a telephone call, was awake from 12:30 a.m. to 5 a.m. on July 22, 1986, and never told him that he suffered from nosebleeds.

Dignan testified that before 3 a.m. on July 22, 1986, he overheard defendant tell other police officers that he had a problem with nosebleeds. Prior to that time, defendant never told him about nosebleeds. Dignan further testified that he saw bloodstains on the interview room floor when he returned from 102d and Bensley on July 22, 1986. He also stated that he saw defendant wiping his nose a couple of times before going out to 102d and Bensley. Boffo and Dignan place the time of arrest at 4 a.m. on July 22, 1986, when they were out looking for Ms. Howard's car.

Detectives Jack Hines and George Patton testified that about 6 p.m. on July 21, 1986, defendant was advised of his *Miranda* rights, and at 9:20 p.m., they took him for a polygraph test, returning about 11:30 p.m. Hines and Patton both denied going to the railroad tracks or ever putting a gun to defendant's head. That night, they testified, defendant was given some hamburgers.

Patton further testified that in the late evening of July 21, 1986, defendant told him that he had a medical condition where he suffered from nosebleeds. Patton stated that after the polygraph test, during the course of the investigation, defendant's nose was bleeding, but he refused medical treatment. Patton further stated that he saw blood on defendant's pants at that time.

When he was later recalled, Patton testified that there was blood on the floor when Hines called him to defendant's interview room at approximately 12:45 a.m. on July 24, 1986. Princess was in the room at the time. Defendant told Patton that when he gets nervous, he sometimes gets nosebleeds, and that sometimes he takes medication for the condition. Patton then got some paper towels and gave them to defendant to clean up the blood on the floor.

Hines further testified that around 1 a.m. on July 24, 1986, Princess went to visit defendant. When she noticed blood on the interview room floor and on defendant's pants, she told him that defendant had nosebleeds when he got excited. When Hines was recalled to the witness stand, he testified that he first noticed blood on the floor and on defendant's pants at 12 a.m. or 12:30 a.m. on July 24, 1986, when Princess went into the room to visit defendant.

John Stout, the polygraph examiner, stated that he gave defendant his *Miranda* warnings before administering the polygraph test. Stout testified that he saw no injuries or puffiness on defendant, no one else was in the room, the test took approximately 1½ hours, and only one test was taken. In addition, Stout testified, defendant stated that he did not have any medical problems and was not on any medication.

Princess Williams, defendant's live-in girl friend, testified that she was taken for a polygraph test at 9 p.m. on July 21, 1986. At that time, the left side of defendant's face was swollen and beaten, and his wrists were swollen with black marks around them. During the evening of July 23, 1986, Princess went to the police station to be fingerprinted. At that time, she observed blood on defendant's pants. She stated that defendant had no problem with nosebleeds.

Detective Yucaitis testified that at 12:30 a.m. on July 22, 1986, he saw defendant eating hamburgers. Yucaitis stated that he gave defendant his *Miranda* warnings and told him that he had failed the polygraph. According to Yucaitis, defendant then stated that he was afraid of Steven Bell and his brother, Kenneth Tillman. After a half-hour interrogation, Yucaitis asked defendant if he would confront Bell, and defendant agreed. Yucaitis testified that defendant went into the interrogation room where Bell was located and said, "I told

him it was you and my brother that killed and raped that woman." Boffo testified that defendant said, "You and Kenneth killed the woman and I'm not going to take the heat for it. And, you might as well confess." Both defendant and Bell testified that defendant said, "I told them the truth." Defendant was quickly taken back to his interrogation room.

Shortly afterwards, Yucaitis again gave defendant his *Miranda* warnings and told him that Bell had implicated him. After a half-hour interrogation, defendant agreed to take the police officers to where Ms. Howard's car was located. Defendant was handcuffed to the wall after 2:30 a.m. on July 22, 1986. At 3 a.m., defendant was taken to 102d and Bensley Streets in Chicago to find Ms. Howard's car. They spent an hour looking for the car, but did not locate it. Yucaitis testified that they did not go to the crime scene that night, although Boffo and Dignan testified that they went to the crime scene about 5 a.m. on July 22, 1986, after going to 102d and Bensley. At the crime scene, defendant was told to go into a dumpster and look for the cord that was used to tie up Ms. Howard. According to the police, defendant said that he threw the cord in that dumpster, but nothing was found.

When they returned to the police station, Yucaitis testified, defendant recanted his story, first stating that he got the information from his brother, Kenneth, and then stating that he had made it all up.

Defendant's brother, Kenneth, testified that he was brought to the police station at 5:30 p.m. on July 21, 1986, and questioned, but was released on July 23, 1986, with no charges brought against him. Kenneth further testified that he saw his brother around 8 or 9 p.m. on July 21, 1986, when Patton brought defendant into his interview room. Defendant told Kenneth, "Ken, I told them the truth." Later, in the middle of the night, Kenneth awoke and heard defendant hollering and crying all night. Kenneth stated that he heard defendant say, "I told you that I didn't do it. And why don't you all believe me and stop, please, please stop."

Kenneth also stated that he saw defendant at noon on July 22, 1986, when he was placed in a room next to Kenneth's. Through a window between the two rooms, Kenneth saw defendant's wrists, which were big, and blood on defendant's pants. At that time, defendant told Kenneth that he had been beaten all night. Kenneth further testified that he heard defendant hollering again during the night of July 22, 1986. Kenneth stated that he was never beaten and that defendant did not suffer from nosebleeds.

Detective Patrick Mokry testified that on July 22, 1986, he took defendant, who was handcuffed, to the washroom and for a drink of water and saw no blood at that time. Detective Hines called the State's Attorney's felony review unit at 6 p.m. on July 22, 1986.

Assistant State's Attorney Timothy Frenzer testified that at 8:30 p.m. on July 22, 1986, and again at 8:30 p.m. on July 23, 1986, he interviewed defendant. Frenzer did not observe any bruises or other signs of abuse nor did he observe blood on defendant's pants. Hines was present during both interviews. Defendant testified that he was interviewed only once by Frenzer.

After the July 22, 1986, interview, Frenzer did not approve filing any charges against defendant. Frenzer did not take notes of either conversation with defendant, nor did he tape the conversations. There were no written or signed statements made by defendant. Defendant was finally charged at 11 p.m. on July 23, 1986. Frenzer further testified that on the evening of July 23, 1986, after defendant was charged, the police officers told him about the nosebleeds. Princess Williams also told him that defendant had a problem with nosebleeds.

Defendant's mother, Winter Tillman, testified that she and her husband went to the police station between 8 and 9 p.m. on July 22, 1986, where they met attorney William O'Neal. Both the attorney and her husband spoke to the police officers in an effort to see defendant, but neither was allowed to see him. Mrs. Tillman also stated that defendant had no problem with nosebleeds.

Attorney O'Neal called himself to the stand to testify that he went to the police station between 8:30 p.m. and 9 p.m. on July 22, 1986. He met defendant's parents and spoke to Sergeant Walker, who was behind the desk. O'Neal's notes indicated that he called upstairs to Area 2 and spoke with Hines at 9 p.m. Hines told him that he could not see defendant because he had not requested an attorney. Defendant's parents were also told that they could not see their son. O'Neal asked to speak to the assistant State's Attorney, but was told that he was currently interviewing defendant and did not want to speak to O'Neal. O'Neal then called attorney Chester Slaughter and left the station at 10 p.m.

Attorney Chester Slaughter testified that he received a phone call from attorney O'Neal on July 22, 1986, between 8:30 and 9 p.m. Attorney Slaughter then called the police station and spoke with Patton. Slaughter told Patton that he was coming to the station to talk to defendant. Patton told him that he could not speak to defendant and would not be allowed upstairs. Slaughter had a second conversation

with Patton at 9:45 p.m. Again, Patton told Slaughter that he could not speak with defendant and hung up.

In the early morning hours on July 23, 1986, defendant was allowed to sleep most of the night. Detective George Winistrofer testified that he gave defendant food and drink around noon on July 23, 1986.

After the arguments on the motion to suppress, the trial court ruled that defendant volunteered information at the crime scene, voluntarily went to the police station to answer questions, was not in custody at that time, requested a polygraph test, was given his *Miranda* warnings, was given food and basic considerations, and voluntarily gave pubic hairs, clothing, and fingerprints. The trial court found that no police officer hit defendant or abused him in any way; there was no blood present on July 21, 1986; defendant never asked for a phone call; and defendant told the polygraph examiner that he was all right. The trial court further found that after defendant was told that he had failed the polygraph, he gave an incriminating statement to Yucaitis. At that point, defendant was in custody, handcuffed, and arrested. Yucaitis then arranged a confrontation between defendant and Bell.

The trial judge stated that he did not believe the testimony of defendant's brother, Kenneth, regarding defendant's hollering. He also stated that defendant had a faulty memory and had poor credibility. The trial court stated that defendant was treated humanely and with consideration, and that no incidents of abuse occurred.

The trial court then found that defendant spoke with the assistant State's Attorney on July 22, 1986, from 8:30 p.m. to 8:50 p.m. At that time, defendant first made an exculpatory, then an inculpatory, statement. The assistant State's Attorney did not mislead or threaten defendant. The court then stated that attorney O'Neal began discussions with the police at 9 p.m. and attorney Slaughter had two conversations with Patton after that. Because defendant's family had retained O'Neal, the trial court ruled, any statements after 9 p.m., on July 22, 1986, were suppressed.

The trial court then found that defendant had a nosebleed at 1 a.m. on July 24, 1986. The trial court ruled that the State did not meet its burden of proving by clear and convincing evidence that the statements after the blood was visible were voluntary. Therefore, any statements after that time were also suppressed on those grounds.

A bench trial immediately followed the finding on the motion to suppress. Although defendant's case was severed from codefendant Bell's, both trials were heard simultaneously by the trial judge. At

trial, Yucaitis testified that defendant made two oral statements. The first statement was that he was afraid of Steven Bell and his brother, Kenneth, because he knew that they had raped and killed a woman, taken some of her property, and taken her to the area of 102d and Bensley Streets. Yucaitis testified that defendant told him that in the early afternoon, the three of them were in the hallway of the apartment building when they saw Ms. Howard come in with her son. She was carrying a birthday cake. Defendant then stated that Kenny said that "he would like to fuck that woman," got in the elevator, and went up to her apartment. Defendant went back in his apartment.

Yucaitis stated that defendant also told him that at 10:30 p.m. that evening, he saw the woman getting on the elevator. Kenneth and Bell were there and asked defendant what floor the woman lived on. Defendant told them, and then went to his apartment. At 3:30 a.m., Kenneth, who appeared nervous, knocked on his door and asked if he could stay the rest of the night. At that time, Kenneth told defendant that he and Bell had raped the woman, taken her property, and had taken her to the area of 102d and Bensley Streets. Yucaitis testified that defendant told him that in the morning, Bell came to his apartment looking for Kenneth. At that time, Bell told defendant that he and Kenneth had stabbed the woman.

After that statement, Yucaitis asked defendant to confront Bell, and defendant agreed. After the confrontation, Yucaitis again spoke to defendant and told him that Bell had implicated him. Yucaitis further testified that defendant then made another statement after being advised of his *Miranda* rights. Yucaitis stated that defendant told him that he was with Bell, but that Bell did everything. Yucaitis then testified regarding defendant's statement:

"That was approximately 10:30 in the evening. They went up on the elevator. They observed the victim entering her apartment. Steven Bell grabbed the victim, knocked her to the ground. They fought. Michael Tillman stated that he went and assisted in holding the victim down to the ground in her apartment, at which time then Steven Bell raped her. After raping her, they brought her to the seventh floor, brought her into the room. They got what he described as braided rope, spread-eagle her out to the radiator, tied her to the radiator. At that time Steven Bell began taking off her clothes, took a knife, and began stabbing the victim. Michael said that he grabbed him, took the knife away from him, and he thinks that he may have stabbed her several times. He then said that he was afraid. He left Steven alone with the victim, went to the rear of the apart-

ment to the kitchen and made it look like it was forced entry to the place *** [b]y breaking the window ***. He then entered back where Steven was and at this time he noted that the child was brought back up. The child was tied up. They then went— left the victim laying there tied to the radiator. They proceeded down to her apartment, took some of her belongings, and he helped carry them to Steven Bell's automobile."

According to Yucaitis, a few hours later, at 5 a.m. on July 22, 1986, defendant recanted everything, saying that he got the information from Kenneth, then saying that he had made it up.

The crime lab technician, Katherine Moorman, testified that she tested defendant's sweat pants and underwear for the presence of blood and semen. The sweat pants tested negative for blood and semen. Although there was no blood visible to the naked eye on the underwear, a chemical test revealed minute color changes, indicating the presence of blood. There was not enough blood present to determine whether it was animal or human blood. There was also no way of telling how long the blood had been present on the underwear. It was also determined that semen was present on the underwear, but Moorman could not estimate how long it had been there. The defense counsel did not object to the blood and semen evidence being admitted into evidence.

On cross-examination by codefendant Bell's attorney, Moorman testified that the samples she tested from Ms. Howard's vagina and rectum were negative for semen and the mouth sample had a weak positive. Further testing revealed no semen present in Ms. Howard's vagina, rectum, or mouth. Defendant's attorney did not move to adopt this cross-examination on behalf of defendant.

Raymond Lenz of the crime lab microscopy unit testified regarding hair and fiber samples taken at the scene and from defendant. Lenz testified that a hair which was recovered from the bathroom floor of apartment 7C was pubic hair. Comparing that single hair to the pubic hair samples from defendant, Lenz's opinion was that the two pubic hairs were similar. At some point during the trial, a microscope was brought into the courtroom and the trial judge used the microscope to personally compare and evaluate the pubic hair samples.

Lenz further testified that dark pink wool fibers found on defendant's sweat pants and underwear, on the victim's shorts, sandals, and panties, and on the bathroom floor were all similar. There was no testimony about how common these fibers are. The trial judge found the fiber testimony to be of no value.

Defendant's attorney did not make an opening statement, but did move to adopt the codefendant's statement as it related to defendant. Defendant's attorney did not present any witnesses, but did join in stipulations between the State and the codefendant. It was stipulated that (1) Ms. Howard's missing car was recovered from persons other than defendant or codefendant, that a knife was found in the car at the time it was recovered, and the car keys were in the ignition; (2) the goods missing from Ms. Howard's apartment were recovered from persons other than defendant and codefendant, and some of the goods were recovered from Clarence Trotter; (3) a gun was recovered at the time the stolen goods were found, the gun was tested by the Chicago police department crime lab and determined to be the gun that was used to kill Ms. Howard; (4) the fingerprints of Clarence Trotter were found on a Coca-Cola can in apartment 7C and there were no fingerprints of defendant or codefendant found in either apartment 7C or Ms. Howard's apartment; (5) neither defendant's nor codefendant's fingerprints were found on Ms. Howard's car; and (6) a personal telephone book was recovered from Ms. Howard's apartment with the pages for the "A's" removed.

After closing arguments, the trial court found defendant guilty of murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)), aggravated criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, par. 12—14(a)(2)), and aggravated kidnapping (Ill. Rev. Stat. 1985, ch. 38, par. 10—2(a)(3)). The trial court found codefendant Steven Bell not guilty of all charges. Defendant was allowed a substitution of attorneys for the post-trial motions and sentencing. After denial of the post-trial motions, a motion to reconsider, and a death penalty hearing, defendant was sentenced to natural life imprisonment for the murder, 15 years' imprisonment for the aggravated kidnapping, and 30 years' imprisonment for the aggravated criminal sexual assault.

On appeal, defendant asserts that the trial court erred in refusing to suppress his statements prior to 9 p.m. on July 22, 1986, which was the time his attorney attempted to speak with him at the police station. The trial court also suppressed any statement made after 1 a.m. on July 24, 1986, which was the time he determined that there was blood visible on the floor and defendant's pants. Once the issue of involuntariness of the confession is raised, the State has the burden of proving that the confession was voluntary. (*People v. Prim* (1972), 53 Ill. 2d 62, 70; *People v. Ruegger* (1975), 32 Ill. App. 3d 765, 768-69.) Voluntariness of a confession by a defendant is determined by examining the totality of the circumstances. *Prim*, 53 Ill. 2d at 70; *Ruegger*, 32 Ill. App. 3d at 769.

Although defendant had no prior criminal convictions, he had previously been arrested. He voluntarily went to the police station and voluntarily submitted his sweat pants, underwear, and pubic hair samples. There was evidence from numerous police officers that defendant was given *Miranda* warnings several times. Defendant signed a consent waiver for the polygraph test and told the polygraph examiner that he had slept the night before.

Although there was conflicting testimony regarding the presence of blood and physical abuse, it is the role of the trial court to judge conflicting testimony. (*People v. Jacquith* (1984), 129 Ill. App. 3d 107, 113.) A trial court's finding that a confession was voluntary will not be overturned unless it is against the manifest weight of the evidence. (*Prim*, 53 Ill. 2d at 70.) Considering the totality of the circumstances, the trial court did not err in not suppressing the statements prior to 9 p.m. on July 22, 1986.

Defendant also asserts that he was denied effective assistance of counsel. Defendant asserts that his trial attorney's performance fell below an objective standard of reasonableness. But for his attorney's ineffectiveness, defendant argues, there existed a reasonable probability that he would not have been convicted. Defendant contends that his trial counsel's failure to interview potential alibi witnesses, combined with his failure to persuasively present the substantial weaknesses in the State's case, and his failure to present any rebuttal evidence to counteract the inculpatory statement denied defendant his sixth amendment right to effective assistance of counsel.

The sixth amendment of the United States Constitution guarantees the right to effective counsel in order to protect the fundamental right to a fair trial. (*Strickland v. Washington* (1984), 466 U.S. 668, 685-86, 80 L. Ed. 2d 674, 692, 104 S. Ct. 2052, 2063.) In order to establish ineffective assistance of counsel under *Strickland*, a defendant generally must prove that his counsel was deficient and that he was prejudiced by that deficiency. *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064; *People v. Albanese* (1984), 104 Ill. 2d 504, 525.

Prejudice requires showing that the counsel's errors were so serious that the defendant was deprived of a fair trial. (*Strickland*, 466 U.S. at 686, 80 L. Ed. 2d at 692, 104 S. Ct. at 2064.) The defendant must show that there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the trial's outcome. (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) In making this determi-

nation, the court must examine the totality of the circumstances. *Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2069.

The ultimate focus of the inquiry must be on the fundamental fairness of the proceeding. (*Strickland*, 466 U.S. at 696, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.) At a minimum, the sixth amendment requires that defense counsel act as a true advocate for the accused, subjecting the prosecutor's case to meaningful adversarial testing (*United States v. Cronic* (1984), 466 U.S. 648, 656, 80 L. Ed. 2d 657, 666, 104 S. Ct. 2039, 2045; *People v. Hattery* (1985), 109 Ill. 2d 449, 461). If counsel does not do so, the adversary process itself is presumptively unreliable. *Cronic*, 466 U.S. at 659, 80 L. Ed. 2d at 668, 104 S. Ct. at 2047; *Hattery*, 109 Ill. 2d at 461.

The *Hattery* court emphasized that the constitutional right of a criminal defendant to plead not guilty includes the obligation of his attorney to structure the trial of the case around his client's plea. (109 Ill. 2d at 463, citing *Wiley v. Sowders* (6th Cir. 1981), 647 F.2d 642, 650.) Even when no theory of defense is available, if the decision to stand trial has been made, counsel must hold the prosecution to its heavy burden of proof beyond reasonable doubt. *Cronic*, 466 U.S. at 656 n.19, 80 L. Ed. 2d at 666 n.19, 104 S. Ct. at 2045 n.19; *Hattery*, 109 Ill. 2d at 465.

Defendant relies on *People v. Bell* (1987), 152 Ill. App. 3d 1007, 1019, where the court ruled that the totality of the defense counsel's performance demonstrated a lack of diligence and numerous errors rendered his representation incompetent. Among those errors were the defense attorney's failure (1) to adequately investigate, interview, and call several witnesses to testify (*Bell*, 152 Ill. App. 3d at 1012); (2) to raise an objection at trial when the State moved to admit the tape-recorded confession and the police officer's testimony about the defendant's confession (*Bell*, 152 Ill. App. 3d at 1014); (3) to tender a jury instruction for voluntary manslaughter; (4) to object to any of the State's 133 exhibits, including blood samples and stains, which should have been objected to on relevancy grounds since they were not identified either as human blood or as to blood type (*Bell*, 152 Ill. App. 3d at 1016); (5) to request a fitness hearing; (6) to offer evidence of allegations of child abuse by the victims; and (7) to object to the prosecutor's improper remarks during closing arguments. (*Bell*, 152 Ill. App. 3d at 1018.) The *Bell* court concluded that the cumulative effect of counsel's errors mandated reversal and a new trial. 152 Ill. App. 3d at 1019.

■ Like the defense counsel in *Bell*, counsel's representation of defendant was deficient in several areas. Defendant's attorney did not

adequately interview possible alibi witnesses. The time of death was between 7:15 p.m. on July 19, 1986, and 9 p.m. on July 20, 1986. The affidavit of Princess Williams, which was presented during the motion for a new trial, accounts for defendant's whereabouts from the night of July 19, 1986, until the early morning hours of July 22, 1986. The defense counsel interviewed Princess only briefly and did not call her to testify even though she was present throughout the trial.

In addition, Ms. Williams provided trial counsel with the names of other persons who could account for defendant's whereabouts during that time. Defendant's post-trial affidavit also stated that four witnesses would have provided him alibis for a substantial period of time. Furthermore, the supplemental police report, submitted with the post-trial motions, included an interview with one of those persons. The defense counsel failed to interview any of these potential witnesses. In fact, defense counsel did not present any defense witnesses at trial.

Although it is true that the acquittal of the codefendant does not require an acquittal of this defendant, it is important to note that the trial court, in finding the codefendant not guilty, stated that his strong alibi witnesses were a consideration in the verdict. Those alibi witnesses did not account for the entire time during which the victim could have been murdered, but did account for the codefendant's whereabouts between 7 p.m. on Saturday, July 19, 1986, and noon on Sunday, July 20, 1986.

Even though the medical examiner's testimony was important regarding the occurrence of the aggravated criminal sexual assault and inconsistencies between the physical evidence and defendant's oral statements, the defense counsel cross-examined her only on the time of death. Furthermore, when the codefendant's attorney elicited important testimony that there was no trauma to Ms. Howard's vagina or rectum, defendant's attorney did not move to adopt that testimony.

While it is true that the lack of trauma alone does not prove that aggravated criminal sexual assault did not occur, it is the State's burden to prove beyond a reasonable doubt that defendant was guilty of an offense that actually occurred. The only evidence that the State presented regarding the aggravated criminal sexual assault was that Ms. Howard was naked from the waist down, that her legs were apart, and defendant's statement that his codefendant had sexual contact with her. The codefendant, however, was acquitted of that charge. Furthermore, there was no evidence presented that defendant had any sexual contact with Ms. Howard.

Defense counsel did not object to the admission of blood samples from defendant's underwear or move to strike that evidence. The State argues that the failure to object was trial strategy and an objection would have been a frivolous gesture because the presence of blood and semen stains on defendant's underwear was relevant and probative of defendant's guilt.

Exhibits that are not identified either as human blood or as to blood type, however, do nothing to prove or disprove defendant's guilt. (*Bell*, 152 Ill. App. 3d at 1016.) There was no determination whether the blood was human or animal, what the blood type was, or how long the blood had been present on the underwear. The blood was not visible to the human eye. It was only through chemical tests that the expert witness determined that it was highly indicative of a blood stain. Therefore, the bloodstains were not probative of defendant's guilt or innocence.

The defense counsel also did not object to the introduction of the semen stains on defendant's underwear, where none was found on Ms. Howard or in any of her cavities. On cross-examination by the co-defendant's attorney, the serology expert testified that no semen was found in Ms. Howard's vagina, rectum, or mouth. Defendant's attorney did not move to adopt that cross-examination. In light of the fact that there was no semen found present in the victim's vagina, rectum, or mouth, the semen stains neither tended to prove or disprove defendant's connection to an aggravated criminal sexual assault. Furthermore, the expert witness could not determine how long the semen stains were present on defendant's underwear.

In finding defendant guilty, the trial judge relied on the blood and semen evidence, stating,

> "I believe that blood and semen were found on the defendant's underpants. There may be small amounts, but there are things throughout our lives that we can't see with our naked eyes that are real. And in this case, I believe that there was blood and semen on the defendant's shorts."

Therefore, the defense counsel's failure to object to that evidence resulted in substantial prejudice to defendant.

The defense counsel failed to object to the crucial testimony of Darron Alexander, who was not listed as a potential witness on the State's answer to discovery. Counsel also failed to object or move to strike Ms. Alexander's testimony regarding an inculpatory oral statement by defendant, which was made prior to the discovery of Ms. Howard's body. Although the State was aware of Ms. Alexander's existence and her testimony concerning defendant's inculpatory state-

ment two weeks prior to trial, it failed to disclose her as a potential witness as required by Illinois Supreme Court Rule 412 (134 Ill. 2d R. 412). In its findings, the trial court stated that Darron Alexander's testimony was highly incriminating.

The defense counsel also failed to call Princess Williams, who told the police on July 23, 1986, that she and defendant had been in apartment 7C shortly before Ms. Howard's body was found. They heard noises coming from the apartment and looked in. Ms. Williams stated that she saw something that looked like table legs upside down.

Further, defense counsel failed to object to the testimony concerning defendant's inculpatory statement to the police or to present any evidence to counteract that testimony. He allowed defendant's statement to be presented into evidence unchallenged at the trial. Although the trial court had ruled that any statements prior to 9 p.m. on July 22, 1986, were admissible, there still was an issue of weight to be given to the statement. Indeed, in the codefendant's trial, where his confession was admitted into evidence, the trial court found it to be inconsistent and inconclusive. Defendant's attorney did not rigorously test the State's case, failing to cross-examine and impeach on the inconsistencies surrounding defendant's statement.

■■ Defense counsel also failed to object to the State's improper comments about the pubic hair evidence. During its closing argument, the State commented that "[t]he public [sic] hair of Michael Tillman was found in the crime scene in that bathroom area"; "Tillman's pubic hair that was found in that bathroom"; and "it was [defendant's] pubic hair that was found among the baby's shoes and strands of cloth that tied him to that crime scene."

Although each of the defense attorney's errors may not alone constitute ineffective assistance, the totality of counsel's deficient performance establishes ineffective assistance of counsel. But for those errors, there was a reasonable probability that the defendant would not have been convicted.

Although defendant did not raise the issue of the State's improper closing argument comments regarding the pubic hair evidence, we apply the plain error doctrine. The error alleged was so substantial that it reflected on the fairness or impartiality of the trial regardless of how closely balanced the evidence was. (*People v. Linscott* (1991), 142 Ill. 2d 22, 28.) In the recent *Linscott* decision, the Illinois Supreme Court granted the defendant a new trial based on improper comments made by the State in closing arguments. (142 Ill. 2d at 34.) Although no objections were made to the prosecutor's comments at trial, the court applied the plain error doctrine. *Linscott*, 142 Ill. 2d at 28.

A closing argument comment is improper if it is not based on relevant evidence in the record or legitimate inferences. (*Bell*, 152 Ill. App. 3d at 1018.) In *Linscott*, the Illinois Supreme Court stated that if a reviewing court cannot say that the prosecutor's improper comments did not contribute to the defendant's conviction, the court should order a new trial. (*Linscott*, 142 Ill. 2d at 28.) The court ruled that the prosecution's comments that the pubic hairs found at the scene were the defendant's pubic hairs was reversible error because the expert witness testified that they were only similar. *Linscott*, 142 Ill. 2d at 34.

In its closing argument, the State commented that "[t]he public [*sic*] hair of Michael Tillman was found in the crime scene in that bathroom area"; "Tillman's pubic hair that was found in that bathroom"; and "it was [defendant's] pubic hair that was found among the baby's shoes and strands of cloth that tied him to that crime scene." With these statements, the State improperly argued that the hair removed from the bathroom was conclusively identified as coming from defendant's pubic region. (*Linscott*, 142 Ill. 2d at 30.) There was no testimony at trial to support these statements. Expert Lenz stated that the pubic hair found in the bathroom was only similar to defendant's pubic hair samples. Unlike a fingerprint, hair cannot be used to identify an individual. *Linscott*, 142 Ill. 2d at 35.

After the closing arguments, however, the trial court found that the pubic hair evidence identified defendant. The trial judge stated:

"I believe that the defendant Michael Tillman's hair was found on this spot with the ligatures involved with the child in the bathroom as shown in the bathroom on the second floor."

Given the expert testimony that the pubic hairs were only similar, the State's improper closing argument comments were error.

Based on the foregoing, the circuit court judgment is reversed and remanded for a new trial.

Reversed and remanded.

RIZZI and TULLY,* JJ., concur.

---

*Justice White heard oral arguments on this case prior to his retirement. Justice Tully reviewed the briefs and record and concurred with the decision.