2020 IL App (1st) 170332-U

No. 1-17-0332

Order filed June 25, 2020

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit |
| | ) | Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 15 CR 619 |
| | ) | |
| TIMOTHY MOORE, | ) | Honorable |
| | ) | Steven Jay Rosenblum, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Gordon and Justice Reyes concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court did not abuse its discretion in admitting evidence that defendant had young girls' underwear with apparent semen stains in his bedroom. The evidence was relevant to the charges that defendant sexually assaulted and abused his young stepdaughter because it supported an inference that defendant was sexually interested in young girls and thus tended to establish his intent and sexual purpose and rebut his contention that his actions had been either unknowing or accidental. In addition, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice or confusion of the issues.

¶ 2    Following a jury trial, defendant Timothy Moore was convicted of predatory criminal sexual assault of a child, criminal sexual assault, and three counts of aggravated criminal sexual abuse, and was sentenced to 33 years in prison. On appeal, defendant argues that the circuit court erred in allowing the State to present what he asserts was irrelevant and unduly prejudicial evidence that numerous pairs of young girls' underwear with apparent semen stains on them were found in his home after his arrest. For the following reasons, we affirm the circuit court's judgment.[1]

¶ 3                                    I. BACKGROUND

¶ 4    Defendant was charged with committing multiple acts of sexual assault and sexual abuse against his stepdaughter, K.S. The State ultimately proceeded to trial on five counts. Count 1 charged defendant with predatory criminal sexual assault of a child for committing an act of sexual penetration upon K.S., namely, contact between his penis and K.S.'s anus, when he was seventeen years of age or older and K.S. was under the age of thirteen. See 720 ILCS 5/11-1.40(a)(1) (West 2018). Count 4 charged defendant with criminal sexual assault for committing an act of sexual penetration upon K.S., namely, contact between his mouth and K.S.'s vagina, when K.S. was under the age of eighteen and a member of defendant's family. See 720 ILCS 5/11-1.20(a)(3) (West 2018). The remaining counts charged defendant with aggravated criminal sexual abuse for committing acts of sexual conduct with K.S., namely, touching his mouth to K.S.'s breast (count 5), placing K.S.'s hand on his penis (count 6), and touching his hand to K.S.'s breast (count 7), all

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

for the purpose of sexual gratification or arousal, when K.S. was under the age of eighteen and a family member of defendant. See 720 ILCS 5/11-1.60(b) (West 2018).

¶ 5    Before trial, the State moved to admit evidence concerning numerous pairs of young girls' underwear with apparent semen stains that were found in defendant's bedroom after his arrest. The State argued that the evidence was relevant and that its probative value outweighed any danger of unfair prejudice. The circuit court granted the State's motion and denied defendant's related motions seeking to bar admission of the evidence as irrelevant and unduly prejudicial. The circuit court also granted the State's motion to admit evidence of uncharged acts of abuse that defendant committed against K.S. under 725 ILCS 5/115-7.3 (West 2018), a ruling defendant does not challenge in this appeal.

¶ 6    At trial, K.S. testified that defendant first touched her inappropriately in 2008, when she was eight years old. At the time, K.S. lived with her mother, defendant, and her two younger half-siblings in an apartment in Lisle. K.S. recounted that, one summer day, she had gone swimming with a friend. When they returned home that evening, they went upstairs to K.S.'s bedroom to change out of their swimwear but K.S.'s friend fell asleep in K.S.'s bed. So as not to disturb her friend, K.S. went to her mother and defendant's bedroom to change, but once there decided to lie down on their bed because she was tired from a long day of swimming. K.S.'s mother was downstairs at the time and (unbeknownst to K.S.) defendant was sitting on the floor in front of the bed, out of K.S.'s line of sight, watching television. K.S. testified that, as she lay in bed, defendant came up behind her and pulled her toward him, causing her backside to come into contact with defendant's body. Then, for about ten minutes, defendant touched K.S.'s butt and vagina with his hand over her swimsuit. K.S. eventually got up and went downstairs, but she did not tell her mother

what had happened. K.S. testified that, as she left the bedroom, defendant told her that if she told her mother what had happened, it would cause problems between them.

¶ 7    K.S. testified about another incident that occurred in 2010, when she was ten years old. At that time, defendant, K.S., and K.S.'s half-siblings were staying at defendant's parents' house in Burbank after the family had been evicted from their apartment in Lisle. (K.S.'s mother was staying elsewhere.) K.S. recounted that she was laying on an air mattress, while her grandparents were asleep in their bedroom and her half-siblings were sleeping on couches nearby, when defendant approached her from behind and pulled her toward him, causing the back of her body to come into contact with the front of his body. K.S. testified that defendant "started rubbing on [her] boobs" over her clothing with his hand. When K.S. got up, defendant put his hand on the back of her head and forced her head down toward his exposed penis, causing his penis to go into her mouth for a couple seconds before K.S. was able to pull herself away and walk to the bathroom. K.S. testified that she did not tell anyone what had happened because she was too afraid.

¶ 8    In 2011, when K.S. was 11 years old, the family moved to a trailer park in Bridgeview. By that time, K.S.'s mother had been diagnosed with cancer. K.S. testified that, on one occasion, defendant invited her to watch television in his and her mother's bedroom while her mother and half-siblings were in the living room. K.S. laid on the bed and defendant shut the bedroom door and sat on the edge of the bed. K.S. testified that, when the show was over, defendant laid next to her on the bed and touched her breasts over her clothing with his hand, put his mouth on her breasts, and forced her hand to touch his penis over his clothing. K.S. testified that she pulled her hand away and tried to get off the bed, but defendant grabbed her and began "air humping [her] from behind" by holding onto her sides and pulling her in and pushing her away from his body

repeatedly. K.S. testified that defendant pulled down both of their pants and her underwear and "put his penis in [her] butt" while continuing to pull her in and push her away. She testified that she felt a "liquidy" substance on her butt and felt defendant's penis inside her anus. K.S. explained that she again did not tell anyone what had happened because she was scared and did not want to hurt her mother.

¶ 9    After K.S.'s mother passed away in 2012, K.S. went to live with her biological father, although she would occasionally return to the trailer in Bridgeview to visit her half-siblings. On one such occasion in October 2014, when K.S. was 15 years old, defendant invited her to go to an amusement park with him and her half-siblings and then spend the weekend at the trailer. When they returned from the amusement park, defendant told K.S. that she could sleep in his bedroom and he would sleep on a couch in the living room. K.S. testified that, as she was trying to fall asleep, defendant came into the bedroom, laid down behind her, and pulled her toward him, causing her lower back and butt to touch his body. She testified that defendant touched her breasts and vagina over her clothes with his hand and then lifted up her shirt and put his mouth on her breasts. She testified that defendant also touched her vagina with his hand under her clothing and then removed her pants and underwear and put his mouth on her vagina. Afterward, she testified, he placed her hand on his penis over his clothing. When it was over, K.S. went to another room and stayed the night. When she went home the next day, she did not tell her father what had happened because she was still too afraid and did not want to lose contact with her half-siblings.

¶ 10    Several weeks later, however, K.S. told a friend about the abuse. She then talked to a school counselor and the grief counselor she was seeing to cope with her mother's passing. Eventually,

she spoke with someone from the Department of Children and Family Services (DCFS) and participated in a victim-sensitive interview. She was then examined by a physician.

¶ 11    In addition to testifying about defendant's abuse, K.S. recalled that her underwear would occasionally go missing when she lived with defendant. She testified that the underwear she wore at the time could be described as "little girl[s'] underwear" and that some pairs had flower designs on them. She recounted that, on one occasion, when she was living in the Bridgeview trailer, she found a "hard" pair of her underwear in a bathroom cabinet drawer.

¶ 12    The State also called defendant's sister-in-law, Debbie Moore, and her daughter, Courtney Moore. Debbie testified that she went to defendant's Bridgeview trailer with Courtney and a friend several months after defendant's arrest to clean it out and prepare it for sale. Debbie testified that, while cleaning defendant's bedroom, she found 20 to 30 pairs of "little girls' underwear" behind a nightstand, under the bed, and behind a dresser in the closet. Based on the underwear's size, color, and design, Debbie opined that they were young girls' underwear. She also testified that the underwear were "crinkled in a ball" and had a crusty substance on them that appeared to be dried semen. Debbie called the police and prosecutor's office to inform them of what she had discovered, but when she was unable to make contact with anyone, she threw the underwear away. She discussed the underwear with defendant in two recorded phone calls while he was in the county jail. The State played snippets of those calls at trial, in which defendant admitted that he collected the underwear but claimed that they belonged to his former wife or ex-girlfriends.

¶ 13    Courtney testified that she cleaned out defendant's trailer with her mother and a friend after defendant was arrested. While there, Debbie showed her numerous pairs of underwear that she had found in defendant's bedroom. Courtney described the underwear as "small in size," with "flowers

and girlie designs" and "colorful bands" around the waist and leg holes. She testified that the underwear were "crumpled in a ball" and appeared to have "a hard crusty substance" on them.

¶ 14    The State's final witness was Detective Dan Matuszak of the Bridgeview police department. He testified that the criminal investigation into K.S.'s allegations of abuse began when he received a report from a DCFS investigator. After receiving the report, Detective Matuszak arranged for K.S. to speak with a trained interviewer at a children's advocacy center. Later that day, Detective Matuszak and another detective located defendant at his trailer and asked him to accompany them to the police station for questioning, which defendant agreed to do. At the station, defendant waived his *Miranda* rights and agreed to speak with the detectives. An audio-video recording of the ensuing four-hour interview was played for the jury.

¶ 15    In the interview, defendant stated that K.S. would often come into his bedroom and lay in bed with him, and he speculated that she did so to make a connection with him. He stated that K.S. would ask him to roll over and, when he did, "her hand would wander" and she would touch his penis over his clothing. He stated that K.S. would also sometimes take his hand and put it on her breast. He claimed that he was half asleep during these encounters, but stated that he might have gotten an erection. He could not say for sure whether K.S. had ever put his hand on her vagina because he was half asleep and would "let her lead the way." He stated that he was "never the aggressor" and that, when K.S. would place his hand on her body, he would leave it there because he thought that was what she wanted. Defendant did not remember his penis being exposed during these encounters, but he could "not say[ ] it's not possible." He also could not recall whether K.S.'s pants were ever down, and he denied that his penis was ever in K.S.'s anus. But he stated that K.S. would "bounce around" and rub her butt against his penis—"almost like a lap dance"—and that

she would "shak[e] and wiggl[e] against [him] until she got the desired effect that she was looking for." He stated that K.S. might have felt his pre-ejaculate and agreed that, if that were the case, it would mean that his penis was exposed and her pants were down.

¶ 16    After the interview ended, Detective Matuszak arrested defendant. He testified that, a year and a half later, he received additional information related to the investigation from Debbie and Courtney Moore, but he did not describe the substance of that information. On cross-examination, Detective Matuszak denied that he told the DCFS investigator to avoid notifying defendant of the DCFS investigation so that defendant would not retain a lawyer.

¶ 17    Before resting, the State entered a stipulation with defendant that, if called, the physician who examined K.S. following her report of abuse would testify that the exam revealed no abnormalities or evidence of trauma, but that "a normal exam is the most common finding in cases of child sexual abuse" and "does not confirm or deny" that abuse occurred.

¶ 18    In defendant's case, the parties entered an additional stipulation indicating that, if called, DCFS employee Harriet Holmes would testify that she spoke with Detective Matuszak the day before defendant's interview and suggested to the detective that DCFS should not contact defendant about its investigation because doing so could jeopardize the criminal investigation. Holmes would also have testified that she asked Detective Matuszak to tell her not to contact defendant and that Detective Matuszak agreed with her suggestion. Finally, Holmes would have testified that, after their conversation, she wrote a report stating that Detective Matuszak asked her not to contact defendant to avoid causing defendant to retain an attorney before detectives could question him.

¶ 19    After entering the stipulation, defendant rested. The parties then delivered closing arguments and the circuit court instructed the jury. Following deliberations, the jury returned guilty verdicts on all counts, and the circuit court denied defendant's motion for a new trial. The court then sentenced defendant to an aggregate term of 33 years in prison. After the circuit court denied defendant's motion to reconsider the sentence, defendant filed a timely notice of appeal.

¶ 20                                    II. ANALYSIS

¶ 21    Defendant argues that the circuit court erred in allowing the State to present evidence that numerous pairs of young girls' underwear with apparent semen stains were found in his home following his arrest. He contends that the evidence was irrelevant and unduly prejudicial.

¶ 22    To be admissible, evidence must be relevant. See Ill. R. Evid. 402 (eff. Jan. 1, 2011). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). Even if relevant, however, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ill. R. Evid. 403 (eff. Jan. 1, 2011). We review a circuit court's ruling on the relevancy and admissibility of evidence under an abuse of discretion standard. See *People v. Morgan*, 197 Ill. 2d 404, 455 (2001). "An abuse of discretion will be found only where the trial court's decision is arbitrary, fanciful or unreasonable or where no reasonable [person] would take the trial court's view." (Internal quotation marks omitted.) *Id.*

¶ 23    Citing *People v. Steele*, 2014 IL App (1st) 121452, defendant argues that we should review the circuit court's evidentiary ruling *de novo* because it did not depend on any factual findings or

credibility determinations. But *Steele* held that "a trial court's ruling on whether a statement is *hearsay* may be reviewed *de novo* when that determination does not involve fact finding or weighing the credibility of the witnesses." (Emphasis added.) *Id.* ¶ 34; see also *People v. Aguilar*, 265 Ill. App. 3d 105, 109 (1994) (reviewing trial court ruling on admissibility of evidence *de novo* where ruling rested on interpretation of an exception to the hearsay rule). *Steele* and *Aguilar* are examples of the limited "exception to the general rule of deference [that] applies in cases where a trial court's exercise of discretion has been frustrated by an erroneous rule of law." (Internal quotation marks omitted.) *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). The exception has no bearing here. The circuit court's ruling on the admissibility of the underwear evidence did not rest on its interpretation of any legal rule or its resolution of any legal question. The court instead was asked to assess the relevance of the evidence and weigh its probative value against the danger of unfair prejudice. Resolution of those questions falls squarely within the circuit court's discretion. Accordingly, we will not reverse the circuit court's evidentiary ruling unless we find that it committed "a clear abuse of discretion." *Morgan*, 197 Ill. 2d at 455.

¶ 24    Defendant contends that the underwear evidence was irrelevant to proving that he committed the charged offenses. But the aggravated criminal sexual abuse counts that defendant faced required the State to prove that he engaged in "an act of sexual conduct" with K.S. 720 ILCS 5/11-1.60(b) (West 2018). The Criminal Code defines "sexual conduct" as "any knowing touching or fondling by the victim or the accused *** of the sex organs, anus, or breast of the victim or the accused *** for the purpose of sexual gratification or arousal of the victim or the accused." 720 ILCS 5/11-0.1 (West 2018). To establish that defendant committed aggravated criminal sexual abuse, therefore, the State needed to prove not only that defendant touched K.S.'s breast with his

mouth and hand and placed K.S.'s hand on his penis, but that he did so for the purpose of sexual gratification or arousal. See *People v. Ressa*, 2019 IL App (2d) 170439, ¶ 35. Evidence that numerous pairs of young girls' underwear with apparent semen stains were found in defendant's bedroom supports an inference that defendant has a sexual interest in young girls. And evidence of defendant's sexual interest in young girls supports an inference that he touched K.S., and had K.S. touch him, for the purpose of his sexual gratification or arousal.[2] The underwear evidence was thus relevant to proving the aggravated criminal sexual abuse charges because it had a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011).

¶ 25    The underwear evidence was relevant, with respect to all of the charges, for another reason. In his recorded interview, defendant admitted that he touched K.S.'s breast with his hand and that K.S.'s hand touched his penis, but he asserted that he was half asleep when the incidents occurred and that K.S. had been the aggressor. He likewise admitted that K.S.'s butt rubbed against his penis, and stated that K.S. might have felt his pre-ejaculate on her, but he claimed that K.S. was the aggressor and that she would "shak[e] and wiggl[e] against [him] until she got the desired effect that she was looking for." Evidence that defendant is sexually attracted to young girls in general, and that he was sexually attracted to K.S. in particular, was thus relevant to rebutting his assertions that K.S. instigated the contact between them and that he was often unaware of what

---

[2] The logical inferences are even stronger in light of K.S.'s testimony that her own underwear would occasionally go missing when she lived with defendant and that she once found a pair of her underwear hidden in a drawer in a bathroom cabinet in a "hard" condition. That evidence tends to show not only that defendant has a sexual interest in young girls generally, but that he was sexually interested in K.S. in particular, thus further supporting the inference that his actions toward K.S. were for the purpose of his sexual gratification or arousal.

was happening. In other words, the underwear evidence was relevant to proving defendant's intent, motive, knowledge, and absence of mistake or accident. Cf. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011) (other-acts evidence is admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident").

¶ 26    Defendant cites several decisions in which the appellate court found that evidence related to underwear was irrelevant in a sexual assault case. But each case is distinguishable. In *People v. Tillman*, 226 Ill. App. 3d 1, 17 (1991), the court held that defense counsel was ineffective for failing to object to evidence of blood and semen stains found on the defendant's underwear. The court explained that the blood stains were not probative of the defendant's guilt because they had not been tested to determine either the blood type present or whether the sample contained human blood. *Id*. In addition, the court noted, the semen stains on the defendant's underwear did not connect him to the sexual assault because there was no evidence that semen had been found on the victim. *Id.*

¶ 27    Similarly, in *People v. Allen*, 27 Ill. App. 3d 1054, 1062 (1975), the court concluded that evidence of blood found on the victim's underwear was irrelevant because other evidence in the case established that the victim did not bleed from her pelvic area during the assault. Finally, in *People v. Daniels*, 301 Ill. App. 3d 87, 98-100 (1998), the court rejected a defendant's contention that he was prejudiced by his lawyer's failure to challenge DNA evidence linking him to a semen stain found on the victim's underwear. The court explained that, because the defendant and his cousin were both involved in a consensual sexual relationship with the victim, "[t]he fact that DNA from one or both of them might be found in [the victim's] apartment would not be surprising." *Id.* at 99. In addition, the court found that "[t]he existence of semen on the [victim's] panties simply

was not relevant" because the victim's underwear had allegedly been removed before the assault. *Id.*

¶ 28    Defendant argues that the underwear evidence here was likewise irrelevant because the underwear was not scientifically tested and because no evidence linked the underwear to the charged offenses. But this contention rests on a misunderstanding of the logical relevance of the underwear evidence. Unlike in the cases discussed above, the relevance of the underwear evidence here does not depend on its tendency to prove that the charged conduct occurred, but rather on its tendency to establish that defendant engaged in the charged conduct intentionally rather than accidentally or unknowingly and (with respect to the charges of aggravated criminal sexual abuse) that he did so for the purpose of his sexual gratification or arousal. As explained above, evidence that defendant possessed numerous pairs of young girls' underwear that appeared to have semen stains on them tends to establish his intent and sexual purpose in committing the charged acts by supporting an inference that he has a sexual interest in young girls. No scientific testing of the underwear or other evidence physically linking it to the charged offenses is necessary to support that inference.[3]

¶ 29    Defendant next argues that, even if relevant, the probative value of the underwear evidence was substantially outweighed by the danger of unfair prejudice and confusion of the issues. He contends that by presenting the underwear evidence through all of its witnesses and introducing two phone calls in which defendant discussed the evidence, the State created "a trial within a trial" concerning the underwear evidence. But counting the number and percentage of witnesses who

---

[3] Debbie testified that she was familiar with the appearance of dried semen, and defendant does not challenge the foundation for her opinion that the underwear she discovered in defendant's bedroom had dried semen on them.

testified about the underwear evidence does not accurately convey the focus of the trial. Although K.S. testified that her underwear occasionally went missing when she lived with defendant and that she once found a pair of her underwear hidden in a bathroom cabinet, the overwhelming focus of her testimony concerned defendant's acts of abuse against her. The State's direct examination of K.S. spans more than 40 pages of the trial transcript, yet her discussion of the missing underwear takes up just two and a half of those pages. The second most important piece of the State's case—defendant's four-hour recorded interview—was likewise focused almost exclusively on defendant's description of his encounters with K.S. and contained no mention at all of the underwear evidence.

¶ 30    In contrast, the testimony about defendant's possession of young girls' underwear made up a comparatively small portion of the State's case. The State's direct examination of Debbie consists of 17 and a half pages of testimony, while Courtney's testimony takes up just two and a half pages. And while the State played snippets of two jail calls in which defendant and Debbie discussed the underwear evidence, each snippet was less than a minute and a half long. Meanwhile, Detective Matuszak did not testify about the underwear evidence at all. While he noted that he received information related to the case from Debbie and Courtney, he did not discuss the substance of that information.

¶ 31    Consistent with the limited role that the underwear evidence played in the State's case, the prosecutor's closing argument focused almost entirely on recounting both K.S.'s testimony about defendant's abuse and the inculpatory statements defendant made in his recorded interview. The State did not reference the underwear evidence in an attempt to paint defendant as "a creepy person" (as defendant suggests) or to urge the jury to convict him on that basis, but instead argued

that the evidence served to corroborate K.S.'s allegations. Viewing the record as a whole, we find no support for defendant's contention that admission of the underwear evidence created "a trial within a trial" or threatened to distract the jury from the actual issues in the case.

¶ 32    Nor did the underwear evidence create a danger of unfair prejudice to defendant that substantially outweighed the evidence's probative value. As explained above, the underwear evidence had significant probative value, both for its tendency to establish that defendant committed the acts charged as aggravated criminal sexual abuse for a sexual purpose, and for its tendency to rebut defendant's assertion that he committed the charged conduct accidentally or unknowingly. At the same time, while evidence that defendant possessed and apparently masturbated into young girls' underwear did not paint defendant in a flattering light, that evidence was far less inflammatory than the allegations of sexual assault and abuse at the heart of the State's case.

¶ 33    Defendant argues that the State unfairly exacerbated the prejudicial effect of the underwear evidence by describing it in vulgar terms during its rebuttal argument. In particular, the prosecutor referred to the dried substance on the underwear as "crusty cum stains" and stated that defendant had been "jerking off" into the underwear. Defendant did not object to these comments at trial and has not asserted a claim of prosecutorial misconduct on appeal. Any such claim is thus forfeited. See *People v. Dat Tan Ngo*, 388 Ill. App. 3d 1048, 1054 (2008) (failure to object to improper closing argument comments and raise asserted error in posttrial motion results in forfeiture); Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) ("Points not argued [in opening brief] are forfeited."). Regardless, while we do not condone the prosecutor's indecorous language, we cannot say that it

created a danger of unfair prejudice from the underwear evidence so great that it substantially outweighed the significant probative value of the evidence.

¶ 34    Because the underwear evidence was relevant and its probative value was not substantially outweighed by the danger of unfair prejudice or confusion of the issues, the circuit court did not abuse its discretion in ruling that the evidence was admissible.

¶ 35                                  III. CONCLUSION

¶ 36    For the foregoing reasons, we affirm the circuit court's judgment.

¶ 37    Affirmed.