THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL DANIELS, Defendant-Appellant.

First District (4th Division)   Nos. 1—96—2831, 1—89—3429 cons.

Opinion filed October 29, 1998.

Rita A. Fry, Public Defender, of Chicago (Alison Edward, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and Celeste Steward Stack, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WOLFSON delivered the opinion of the court:

This is one of the first, if not the first, criminal cases in Illinois where a trial judge allowed the State to present DNA evidence against the accused. One of the defendant's contentions is that his attorney was ill-equipped to challenge the evidence. We examine that contention, as well as the State's claim that the DNA evidence did defendant no harm.

In this consolidated appeal Michael Daniels (Daniels) seeks review of his 1989 convictions for murder and aggravated criminal sexual assault, his sentence of natural life imprisonment, and the 1996 order denying his petition for postconviction relief. We affirm.

FACTS

On the morning of August 10, 1987, Birgitte Andersen (Andersen) was found murdered in her apartment at 1333 W. Birchwood in Chicago. Daniels, who recently had been dating Andersen, was arrested later that same day. Less than 12 hours later he gave a signed, written statement to an assistant State's Attorney implicating himself in the murder.

The August 1987 grand jury indicted Daniels on three counts of first degree murder and two counts of aggravated criminal sexual assault.

In May 1988 and continuing on into August 1988, evidence was heard on Daniels' motion to suppress his statement. After hearing all the evidence, the trial court denied the motion.

In October 1989, a *Frye* hearing was held to determine the admissibility of DNA tests performed by the Federal Bureau of Investigation (FBI). See *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923) (before novel scientific evidence may be admitted in court the principles on which the evidence is based must be shown to be generally accepted in the relevant scientific community). The court decided to admit the evidence but, on the defendant's motion, excluded statistical probabilities evidence. The trial judge said the probabilities evidence tended to be overpersuasive.

Later that same month, on October 23, 1989, Daniels' jury trial commenced. As his defense, Daniels attempted to show that his cousin, Mark Sublett, had committed the murder. Daniels contended they each had equal motive for killing Andersen—jealousy.

The jury learned that Sublett, though married, had been having a relationship with Andersen since June 1987. Sublett said he stayed at Andersen's apartment two to three times per week. Sublett also had another girlfriend, Michelle Ordman.

On the evening of August 9, 1987, Sublett was with Ordman. They met Daniels at a liquor store and then they all went to the beach to drink. Around midnight they left the beach. Sublett, Ordman, and Daniels rode in Sublett's car to a hotel, where Sublett and Ordman registered for the night. Sublett and Ordman then agreed to drive Daniels home. On the way, however, Daniels asked to be dropped off at an apartment building on Birchwood. Sublett knew Andersen lived in the same building and, he said, he became curious. He accompanied

Daniels into the apartment. When Daniels went up to Andersen's apartment, Sublett, to Daniels' surprise, opened the door with his own set of keys. It was then that Sublett and Daniels discovered that Andersen had been dating them both at the same time. Sublett said Andersen was surprised to learn that he and Daniels were cousins.

The evidence also showed, however, that Sublett left Andersen's apartment and went back to the hotel with Ordman. Ordman corroborated Sublett's testimony and said Sublett never left the hotel room until much later that morning when they left together.

Both Ordman and Sublett testified that, at about noon on August 10, 1987, they arrived at Andersen's apartment. Sublett unlocked the door with the keys he had. Sublett entered the apartment, with Ordman behind him. He said he saw Andersen's leg hanging off the bed, so he yelled at Ordman to stay out.

Sublett ran upstairs to another apartment and knocked, but no one answered. Sublett returned to Andersen's apartment, grabbed a suitcase of clothes he had been keeping there, then drove with Ordman to Daniels' Evanston home. At the Daniels residence, Sublett accused Daniels of killing Andersen. He attacked Daniels with a fan. Sublett cut himself on the fan. There was blood on his clothes.

Daniels' mother called the police. When the Evanston police arrived at Daniels' residence, Sublett was sitting outside the apartment with a bandage on his hand due to the injury he received from the fan. Sublett told the police Daniels killed Andersen. Sublett then accompanied the police to Andersen's apartment and gave them keys to enter the apartment. The police found Andersen's partially nude body lying on the bed.

The police testified that, at first, Sublett was treated as a suspect. He was placed under arrest, advised of his rights, and turned over to the Chicago police. The Chicago police took Sublett to the station, where he was questioned about the murder. Based on Sublett's accusations, Officer Rucci was sent to Evanston between 12:30 and 1 that afternoon to pick up Daniels. Daniels was seated in an Evanston police car. He was not handcuffed. Officer Rucci testified Daniels was not placed under arrest at this time. Daniels agreed to accompany Rucci to the station for questioning. Daniels was taken to Area 6 and placed in a locked interview room.

Later, the police picked up Ordman and brought her to the station. Sublett, Ordman, and Daniels were interrogated at Area 6 of the Chicago police department.

Detective Orr testified he first spoke with Daniels at about 5 p.m. Daniels was seated in an interview room with one arm handcuffed to a ring on the wall. Detective Orr advised Daniels of his rights and

questioned him about the Andersen murder. Orr told Daniels his cousin (Sublett) was accusing him of murdering Andersen. Daniels admitted being at the apartment but denied killing Andersen.

After two more discussions with Daniels in which Daniels denied killing Andersen, Detective Orr spoke with Daniels at about 8:15 p.m. and asked if he would agree to speak with Sublett. Daniels agreed. Sublett was brought into the room. He pleaded with Daniels to tell the police what happened. At this point, Daniels admitted he hit Andersen.

Sublett immediately was taken from the room and Detective Orr continued questioning Daniels. Now Daniels told Detective Orr he met Andersen on the beach three days ago and "fell in love" with her. Daniels said he became enraged when he learned Andersen was having a sexual relationship with Sublett. Daniels told Orr he first slapped Andersen in the face, then punched her twice. When he punched her the first time, she hit her head on the edge of a bedside table. That's when he punched her again.

Daniels said while he was punching Andersen he thought he heard someone coming, so he ran out of the apartment. When the unidentified person passed by, Daniels said, he returned to the apartment. Daniels said Andersen was now sitting up with her feet over the edge of the bed. She was bleeding from the back of the head. Blood was coming from her mouth, making it difficult for her to speak. Andersen was shaking. Daniels said he took a rag and stuffed it in Andersen's mouth. When he did this, Andersen grabbed Daniels' hand and scraped one of the fingers of his left hand. After putting the rag in Andersen's mouth, Daniels said, he left the apartment and went home.

Detective Orr testified he observed a long scrape mark on the middle finger of Daniels' left hand, consistent with the type of injury Daniels said he received from Andersen.

Detective Orr testified he broke off questioning after receiving the above information. Later, however, Detective Orr confronted Daniels with evidence that Andersen was partially nude and appeared to have been sexually assaulted. Daniels then admitted that, after putting the rag in Andersen's mouth, he had removed Andersen's underpants and masturbated on her, climaxing on her vagina.

Detective Orr said an assistant State's Attorney was called to the station. Sublett, Ordman, and Daniels all provided the assistant State's Attorney with signed, written statements. Sublett and Ordman testified at trial consistent with their written statements. Daniels' statement, which contained the information he told Detective Orr implicating himself in the murder, was admitted as evidence at trial.

For his defense, Daniels was able to establish at trial that Sublett had a violent temper. On cross-examination, Daniels was able to show

that at the time of trial Sublett was serving a sentence on a charge of aggravated battery. Also, Ordman testified Sublett had severely beaten her on more than one occasion.

Nevertheless, the physical evidence fit the statement Daniels gave police. Photographs of the crime scene and the autopsy report indicated that Andersen was found on the bed of her apartment with a bloody sheet and pillow over her face. The lower half of her body was nude. Her underpants were lying beside the bed. When the sheet and pillow were removed, it was discovered that a shirt was stuffed in Andersen's mouth.

The medical examiner testified the external examination of Andersen's body revealed six, irregular, elongated lacerations to the back of Andersen's head, as well as seven abrasions, three bruises, and one laceration to Andersen's face. There were no skull fractures. There was an elongated imprint-type mark on the left side of Andersen's neck and the tip of two of Andersen's fingers on the left hand showed bruising or small hemorrhaging.

The medical examiner also found blood smears in and around Andersen's rectum and vaginal areas, as well as bruising around the vaginal orifice. A white mucoid substance was found just inside the vaginal opening. He said vaginal swabs, fingernail clippings, and blood samples were taken from the deceased and turned over to the Chicago crime lab. The medical examiner listed suffocation and blunt force trauma as the causes of death.

A fingerprint identification expert from the Chicago police department testified latent prints lifted from a drinking glass found next to the bed of the deceased matched Daniels' known prints.

A serologist working in the crime lab of the Chicago police department testified about blood tests performed on Daniels, Andersen, and Sublett. The serologist said Daniels' and Andersen's blood type was Type A. Sublett's blood type was Type AB. All three were secretors, meaning their blood type could be determined from other bodily fluids, such as saliva or semen.

Tests performed on the mucoid substance found in Andersen's vaginal swab showed only Type A blood type was present. This test included Daniels and excluded Sublett as a contributor. Tests done on the semen stain found on Andersen's underpants, however, showed Type AB blood type was present. This meant Sublett, but not Daniels, could have been a contributor.

Tests performed on the blood found on the clothes Sublett was wearing at the time of his arrest showed it to be Type AB, consistent with it being Sublett's own blood.

The court also admitted into evidence the results of DNA tests

performed at the FBI testing facility. The FBI expert testified the sample from the vaginal swab was too degraded and contained insufficient DNA to produce any viable DNA information. Thus, the results of DNA tests done on the vaginal swab were inconclusive, neither including nor excluding either Daniels or Sublett from being a contributor.

The FBI expert testified, however, tests done on a sample taken from the underpants "matched" Daniels and excluded Sublett. This DNA evidence was inconsistent with the results of the Chicago police department's blood tests done on the underpants, as Daniels made clear through the use of his expert blood witness.

The inconsistency in the results is seen more clearly in the following chart:

Daniels = Type A          Sublett = Type AB

### Vaginal Swab

CPD blood test—Only Type A blood found—included Daniels, excluded Sublett.

FBI DNA test —   No result or "inclusive"—neither included nor excluded either Daniels or Sublett.

### Underpants

CPD blood test—Only Type AB found—included Sublett, excluded Daniels.

FBI DNA test — "match" to Daniels' DNA, no "match" to Sublett's DNA—included Daniels, excluded Sublett.

After several days of trial testimony, a verdict was reached on November 1, 1989. The jury found Daniels guilty of murder and aggravated criminal sexual assault.

On November 2, 1989, a death penalty hearing was held. The jury did not unanimously find Daniels eligible for the death sentence.

On December 12, 1989, Daniels was sentenced to a term of natural life for the murder conviction and a concurrent term of 30 years' imprisonment for the sexual assault conviction. Notice of appeal was filed December 13, 1989.

On April 11, 1991, Daniels obtained a stay of his direct appeal so he could proceed with postconviction proceedings. A *pro se* postconviction petition was filed on April 26, 1991. In his petition, Daniels claimed: (1) he received ineffective assistance of counsel based on defense counsel's failure to challenge the State's DNA evidence through the use of an independent expert, and (2) he was denied due process of law because (a) the State's expert testimony that the DNA evidence "matched" Daniels was inaccurate and misleading, and (b) Sublett perjured himself.

In a subsequent court hearing counsel was appointed to assist Daniels in his postconviction petition. Appointed counsel repeatedly requested, and was granted, continuances pending the filing of a supplemental postconviction petition. On August 5, 1993, the supplemental petition was filed. The supplemental petition encompasses over 700 pages and is contained in three volumes of the supplemental postconviction common law record.

On March 24, 1994, the State filed a motion to dismiss and a motion to strike certain affidavits and exhibits filed with the supplemental petition. Argument on the motions was set for May 24, 1994, but it does not appear from the record that a hearing took place on that date. The court did not begin to hear argument on Daniels' postconviction petition until October 13, 1994.

On October 13, 1994, the court indicated the hearings on the petition would be bifurcated. The first hearing, the court said, would focus on the claims of ineffective assistance of counsel, newly discovered evidence concerning the admission of DNA evidence, and the alleged *Brady* violation, *i.e.*, the failure of the State to provide defense counsel with favorable evidence. Argument was heard on these issues and, after hearing argument, the court reserved ruling on the State's motion to dismiss.

On March 24, 1995, the court heard argument on the State's motion to strike exhibits and on the remaining issues in Daniels' postconviction petition. Once again, after hearing argument the court reserved ruling.

Finally, on June 13, 1995, the court issued its ruling on the matters raised in Daniels' postconviction petition. The court said:

> "Concerning the matters that we argued on the DNA, and those are issues revolving around the ineffective assistance of counsel, the motion to dismiss will be sustained.
>
> Concerning the areas of perjury, and [*sic*] that newly discovered evidence, I will allow the evidentiary hearing."

Appeal was taken from the court's final ruling. That appeal was consolidated with the direct appeal, which had been held in abeyance pending a decision on the postconviction petition.

In his appellate brief, Daniels' counsel makes no effort to distinguish between issues raised in his direct appeal and issues raised in his appeal from the denial of postconviction relief. We have discerned the issues to be: (1) whether the postconviction court erred when it found Daniels had not received ineffective assistance of counsel despite counsel's failure to properly challenge the DNA evidence presented by the State; (2) whether the postconviction court erred by denying him relief based on newly discovered evidence; (3) whether

the postconviction court erred when it found Daniels had not been denied due process of law based on the State's failure to disclose scientific evidence favorable to the defendant; (4) whether the trial court erred by failing to instruct the jury on the lesser included offense of involuntary manslaughter; and (5) whether the trial court abused its discretion by imposing a sentence of natural life.

Though appellate counsel addresses the postconviction issues first, we feel it appropriate to begin with the issues raised in the direct appeal.

ISSUES

## A. DIRECT APPEAL

Failure to Give an Involuntary Manslaughter Instruction

Daniels contends the evidence at trial supported an instruction on the lesser included offense of involuntary manslaughter. He says the trial court erred when it refused to instruct the jury on this offense.

The question, as posed by a recent supreme court opinion, is whether "there is some evidence to support the giving of the instruction." *People v. DiVincenzo*, 183 Ill. 2d 239, 249 (1998).

In *DiVincenzo*, the defendant and the victim, individuals of the same general size and strength, engaged in a weaponless fight. The court held it was an abuse of discretion to refuse to give the jury an involuntary manslaughter instruction.

■ The basic difference between involuntary manslaughter and first degree murder is the mental state that accompanies the conduct resulting in the victim's death. *People v. Foster*, 119 Ill. 2d 69, 87, 518 N.E.2d 82 (1987).

For first degree murder, the defendant knows his acts create a strong probability of death or great bodily harm. 720 ILCS 5/9—1(a)(2) (West 1996). To step down to involuntary manslaughter, the defendant performs acts likely to cause death or great bodily harm and he performs those acts recklessly. 720 ILCS 5/9—3(a) (West 1996). Reckless conduct generally involves a lesser degree of risk than conduct that creates a strong probability of death or great bodily harm. *DiVincenzo*, 183 Ill. 2d at 250.

■ *DiVincenzo* provides us with the factors to examine to determine whether the trial judge abused his discretion when he refused the involuntary manslaughter instruction. These include: (1) the disparity in size and strength between the defendant and the victim; (2) the brutality and duration of the beating and the victim's injuries; and (3) whether the defendant used his bare fists or a weapon, such as a gun or knife. *DiVincenzo*, 183 Ill. 2d at 251.

Finally, we are instructed to examine the nature of the killing. If it shows, either by multiple wounds or the victim's defenselessness, that the defendant did not act recklessly, "an involuntary manslaughter instruction is generally not warranted." *DiVincenzo*, 183 Ill. 2d at 251.

■ Applying these factors to this case we conclude the trial court did not abuse its discretion when it refused the involuntary manslaughter instruction.

Even if we were to ignore the uncontradicted evidence of multiple and severe lacerations and abrasions on Andersen's body, the defendant's own signed statement takes this case out of involuntary manslaughter.

There was no mutual combat here. This 18-year-old young man struck a defenseless woman while she was lying on a bed. His anger was fueled by her admission of sexual contact with Sublett. As she tried to get up, he punched her with his fist. Her head hit the edge of the table. Then he punched her again. He ran out of the apartment, then came back, observing blood coming from the back of her head and from her mouth. She was trying to say something, but succeeded only in making a bubbling sound. His response was to stuff a rag in her mouth, remove her underwear, and "jerk off" on her after brushing aside her feeble attempt to stop his attack. He then left, retrieved his bicycle, and went home for some sleep. She died because, in her weakened condition, with the rag stuffed in her mouth, she was unable to breathe.

These facts fall squarely within the purview of those cases that have held severe and vicious beatings of helpless victims cannot be described by any rational jury as involuntary manslaughter. See *People v. Ward*, 101 Ill. 2d 443, 451, 463 N.E.2d 696 (1984); *People v. Addison*, 236 Ill. App. 3d 650, 603 N.E.2d 19 (1992); *People v. Reeves*, 228 Ill. App. 3d 788, 798-800, 593 N.E.2d 683 (1992). Also see *People v. Washington*, 257 Ill. App. 3d 26, 35, 628 N.E.2d 351 (1993), quoting *People v. Perez*, 108 Ill. 2d 70, 81, 483 N.E.2d 250 (1985) ("In Illinois, 'an included-offense instruction is required only in cases where the jury could rationally find the defendant guilty of the lesser offense and not guilty of the greater offense' ").

The jury in this case was properly instructed.

## B. POSTCONVICTION APPEAL

■ In three of Daniels' issues on appeal, he seeks review of the trial court's rulings on claims brought under the Illinois Post-Conviction Hearing Act (the Act) (725 ILCS 5/122—1 *et seq.* (West 1996)). A postconviction petition is a collateral attack on the judgment of conviction. A petitioner is limited to allegations of constitutional

violations that were not and could not have been raised previously. *People v. Steidl*, 177 Ill. 2d 239, 249, 685 N.E.2d 1335 (1997). An evidentiary hearing is required only when there has been a significant showing that defendant has suffered a substantial deprivation of his constitutional rights. *People v. Coleman*, 168 Ill. 2d 509, 537, 660 N.E.2d 919 (1995).

■ Recently, our supreme court clarified the standards by which courts of review evaluate rulings made on postconviction petitions. See *People v. Coleman*, 183 Ill. 2d 366 (1998). The court acknowledged the manifestly erroneous standard, which "represents the typical appellate standard of review for findings of fact made by a trial judge," had been applied in the past when trial courts denied postconviction relief after a full evidentiary hearing. *Coleman*, 183 Ill. 2d at 384-85. See also *People v. Griffin*, 109 Ill. 2d 293, 487 N.E.2d 599 (1985); *People v. Bracey*, 51 Ill. 2d 514, 283 N.E.2d 685 (1972).

But when a trial court dismisses a postconviction petition without conducting an evidentiary hearing, the court said, no deference is to be given a trial court's determination. In these instances, the trial court has decided the petition does not contain sufficient allegations of constitutional deprivations. That inquiry does not require any fact finding or credibility determinations, since "all well-pleaded facts that are not positively rebutted by the original trial record are to be taken as true." *Coleman*, 183 Ill. 2d at 385.

In an appeal from such a ruling, the reviewing court makes the same determination, *i.e.*, "whether the allegations in the petition, liberally construed and taken as true, are sufficient to invoke relief under the Act." Since the question is a legal one, the reviewing court must be free to make its own independent assessment of the allegations. Review is *de novo*. *Coleman*, 183 Ill. 2d at 388.

Ineffective Assistance of Counsel
■ The first claim in Daniels' appeal from the dismissal of his postconviction petition is that he received ineffective assistance of counsel at trial. This issue was not raised as part of his direct appeal. Ordinarily, the failure to raise a claim of ineffectiveness of trial counsel in the direct appeal renders the issue waived in postconviction proceedings. See *People v. Orange*, 168 Ill. 2d 138, 149, 659 N.E.2d 935 (1995); *People v. Thompkins*, 161 Ill. 2d 148, 157-58, 641 N.E.2d 371 (1994).

If, however, it is argued that the evidentiary basis for the claim of ineffectiveness is outside the record and, therefore, cannot be considered by a reviewing court in a direct appeal, or if the facts relating to the competency of counsel are newly discovered, the waiver rule is relaxed. *People v. Steidl*, 177 Ill. 2d at 250; *People v. Britz*, 174 Ill. 2d 163, 177, 673 N.E.2d 300 (1996).

In this case Daniels asserts his ineffectiveness claim requires consideration of materials that were not part of the record or were unavailable at the time of trial. We find, therefore, he has not waived review and we will address its merits.

■ Any claim of ineffective assistance of counsel, regardless of the context in which it is raised, is reviewed using the same standard—the *Strickland* standard. *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). This standard requires: (1) a showing that counsel's performance, judged by prevailing professional norms, was deficient; and (2) a showing of substantial prejudice stemming from the deficiency. *Strickland v. Washington*, 466 U.S. at 687-88, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. Proof of prejudice is a necessary element. If the prejudice prong cannot be satisfied, it is unnecessary for a reviewing court to consider whether an attorney's performance was competent. *People v. Caballero*, 152 Ill. 2d 347, 604 N.E.2d 913 (1992).

To establish deficiency, a defendant must overcome the strong presumption that the challenged action or inaction by counsel was the product of sound trial strategy. *People v. Griffin*, 178 Ill. 2d 65, 73-74, 687 N.E.2d 820 (1997); *People v. Sanchez*, 169 Ill. 2d 472, 487, 662 N.E.2d 1199 (1996); *People v. Flores*, 153 Ill. 2d 264, 283, 606 N.E.2d 1078 (1992). Even where an attorney's performance may be assumed to be incompetent, a new trial is not warranted unless there exists a reasonable probability that, but for the attorney's errors, the result of the proceedings would have been different. *Strickland*, 466 U.S. at 693, 80 L. Ed. 2d at 698-99, 104 S. Ct. at 2068.

Daniels' ineffectiveness claim focuses on trial counsel's handling of the State's DNA evidence. He claims his trial counsel failed to meaningfully challenge the DNA evidence proffered by the State.

Daniels asserts his trial was the first in Illinois in which DNA evidence was admitted. He contends the record, viewed in conjunction with affidavits and materials attached to his postconviction petition, demonstrates that the trial court received erroneous evidence from which it could determine the reliability of the DNA evidence. This, he says, was due to trial counsel's ineffective challenge of the DNA evidence.

Specifically, Daniels claims trial counsel (1) failed to request and obtain adequate discovery regarding the State's DNA evidence, (2) failed to consult an outside expert to review the State's DNA evidence, (3) failed to present independent DNA expert testimony at the *Frye* hearing or at trial, and (4) proceeded without adequate knowledge to conduct a proper cross-examination of the State's DNA expert.

Daniels contends it was error for the trial court to have dismissed

the ineffectiveness claim in his postconviction petition without an evidentiary hearing. He asks this court to grant him a new trial, or, in the alternative, an evidentiary hearing on the issue of his trial counsel's effectiveness.

The State responds that the trial court properly dismissed the allegations of ineffectiveness without an evidentiary hearing. The State denies Daniels' trial counsel was deficient in his representation of defendant in matters related to the DNA evidence. But even if trial counsel's performance fell below an objective standard of reasonableness, says the State, defendant cannot show he was prejudiced. The DNA evidence was not critical, the State says, and the remaining evidence of Daniels' guilt was overwhelming. The State concludes no new trial is required because Daniels' trial was not fundamentally unfair and the result has not been shown to be unreliable.

■ We find the record supports the State's position. Though we agree opposition to the admission of DNA evidence by Daniels' trial counsel could have been more vigorous, this does not mean his performance fell below an objective standard of reasonableness or constituted a deficiency. Nor do we find any showing of prejudice in defense counsel's approach to the DNA evidence.

In *People v. Steidl*, 177 Ill. 2d 239, 256, 685 N.E.2d 1335 (1997), the court said, "Whether a failure to investigate amounts to incompetency depends upon the value of the evidence to the case." The same can be said here—whether a failure to challenge certain evidence amounts to incompetence will depend on the value of the evidence that was admitted. We cannot see, in light of the entire record, how Daniels would have been better off if the DNA evidence was excluded and the Chicago police department serologist's tests were the only forensic evidence presented at trial.

It is important to remember evidence presented at trial showed that Daniels and Sublett were both having consensual sexual relationships with Andersen. The fact that DNA from one or both of them might be found in Andersen's apartment would not be surprising. The State's purpose in submitting the vaginal swab and panties to the FBI for DNA testing was to corroborate Daniels' confession to a nonconsensual attack on the near-lifeless body of Andersen. To that extent, the DNA testing failed.

To prove a sexual assault and corroborate Daniels' statement, the State had to link Daniels to the "mucoid substance" found in Andersen's vagina. Additionally, since Daniels said he removed Andersen's panties before assaulting her, linking Daniels to the semen stain on the panties was not critical. The existence of semen on the panties simply was not relevant.

The FBI expert was unable to link Daniels to the vaginal swab. The FBI expert testified the results of DNA testing done on the vaginal swab were inconclusive. The damaging evidence came from the serologist who testified that testing done at the Chicago crime lab on the vaginal swab showed that semen was present and a person having Type A blood type was the contributor. This evidence supported the State's position that Daniels, not Sublett, contributed to the "mucoid substance" found in Andersen's vagina. The serologist's testimony, not the DNA evidence, corroborated Daniels' statement regarding a criminal sexual assault.

By the same token, in keeping with Daniels' statement that he removed Andersen's underpants before assaulting her, the serologist testified the semen stain in the crotch of Andersen's underpants came from a person having a Type AB blood type. No Type A activity was found. This implicated Sublett, but not Daniels, as the contributor to the semen found in the underpants.

The FBI's DNA testing, however, indicated that Daniels' DNA "matched" the DNA found in the semen stain in Andersen's underpants. The FBI's DNA evidence contradicted the State's blood evidence. It called into question the reliability of both the DNA testing and the crime lab's blood testing. It formed the basis for Daniels' closing argument:

> "So if Presley [the FBI expert] is that certain about the DNA test, that certain that the semen in those panties belongs to Michael Daniels, then members of the jury, if you accept the testimony of Mr. Presley, you must accept that the semen on the vaginal swab identified by the Chicago Crime Laboratory cannot be Michael Daniels' because it is a Type A. And we know that a person who is an A secretor cannot secrete AB. Reasonable doubt."

It appears defense counsel's trial strategy was to use the State's DNA evidence as a weapon to attack the credibility of all forensic evidence. The DNA evidence was, after all, Daniels' only basis for discrediting the State's blood test evidence concerning the vaginal swab, which corroborated Daniels' admission of sexual assault. The blood test evidence otherwise was unchallenged.

We do not find defense counsel's conduct at trial to be deficient, nor do we find prejudice to Daniels stemming from counsel's failure to challenge the reliability of the DNA evidence. The evidence, apart from the DNA evidence, overwhelmingly supported a finding of Daniels' guilt.

It is true Daniels was able to show that he and Sublett first learned on August 10, 1987, that they were both sexually involved with Andersen and so, presumably, each had a similar motive for murder-

ing Andersen. Daniels also made it evident to the jury that Sublett had a temper, had beaten Ordman on various occasions in the past, and was serving a sentence for aggravated battery. Also, Sublett had keys to Andersen's apartment, which caused him to become the initial suspect in the murder investigation.

But Sublett had an alibi for the time of the murder. He was with Ordman. Ordman corroborated this.

Furthermore, on the afternoon of August 10, 1987, Daniels voluntarily went to the police station and, within a short time, provided the State with its most damaging evidence against him—his oral admissions to Detective Orr and the accompanying signed, written statement to the assistant State's Attorney. From the statement it was clear Daniels knew details of the murder that could be known only by the murderer or someone present at the time of the murder. He knew that a cloth was stuffed into Andersen's mouth. He described exactly Andersen's position on the bed and what she had been wearing. He knew her underpants had been removed.

Furthermore, Daniels' statement was consistent with the physical evidence presented at trial. Daniels' description of his sexual assault on Andersen was consistent with the medical examiner's testimony that blood was found smeared around the exterior of the rectal and vaginal openings and a "mucoid substance" was found at the front of the vaginal opening.

The conclusion we reach after reviewing all of the evidence presented at trial is that counsel's failure to meaningfully challenge the reliability of the DNA evidence, if error at all, was not a significant factor in Daniels' conviction. There is no reasonable probability that the results would have been different had the DNA evidence been excluded or more strenuously challenged.

The postconviction petition allegations of ineffective assistance of counsel are not borne out by the record. The hundreds of pages of documentation and affidavits attached to the supplemental postconviction petition which allegedly show the DNA testing performed by the FBI was not reliable and should have been challenged by counsel simply are not relevant to the issue of ineffective assistance of counsel. We find it reasonable to presume counsel's actions with regard to the State's submission of DNA evidence were part of his trial strategy to refute other, more damaging evidence. No hearing was required. There was nothing to hear.

The significance of the DNA evidence to the State's case is made evident by the fact that the prosecutor's initial closing argument made only a fleeting reference to it—three sentences. The defendant's closing argument, on the other hand, exploited the contradictions between the DNA evidence and the blood evidence.

Because statistical evidence was kept out of the trial, the prosecutor argued the "match" between the DNA samples in the panties and Daniel's DNA. A similar comment by a prosecutor in *People v. Moore*, 171 Ill. 2d 74, 102-03, 662 N.E.2d 1215 (1996), was held to be appropriate.

While this case may have been early in the history of forensic DNA testimony, it was not unique in Illinois. Cases covering a similar time frame upheld the use of DNA identification evidence. See *People v. Miles*, 217 Ill. App. 3d 393, 577 N.E.2d 477 (1991); *People v. Lipscomb*, 215 Ill. App. 3d 413, 574 N.E.2d 1345 (1991).

We note that in *Miles* the defendant claimed his trial lawyer was ineffective because he did not present an expert witness to challenge the prosecution's DNA experts. The *Miles* court held, as we do, that the defendant did not show his lawyer failed either prong of the *Strickland* test. We say, as the *Miles* court said: "he did the best he could given the overwhelming evidence of his client's guilt." *Miles*, 217 Ill. App. 3d at 406.

■ Since we find no basis for defendant's claim that he received ineffective assistance of counsel, we find no error in the trial court's dismissal of this claim without an evidentiary hearing.

CONCLUSION

For the reasons stated above, we affirm Daniels' conviction for murder and aggravated criminal sexual assault and the natural life sentence imposed. In addition, we find Daniels was not entitled to a new trial based on matters raised in his postconviction and postjudgment petitions. Issues pertaining to the DNA evidence, which the trial court dismissed without an evidentiary hearing, did not raise sufficient allegations of constitutional deprivations. The trial court's decision to deny Daniels relief based on allegations of perjury, which the trial court reached after a full hearing, was not against the manifest weight of the evidence.

Affirmed.

McNAMARA and HOFFMAN, JJ., concur.