2022 IL App (2d) 210113-U
No. 2-21-0113
Order filed July 26, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 14-CF-565 |
| MODESTO ALARCON, | ) ) ) | Honorable David P. Kliment, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HUDSON delivered the judgment of the court.
Presiding Justice Bridges and Justice Hutchinson concurred in the judgment.

**ORDER**

¶ 1    *Held*: Trial court did not err in its second-stage dismissal of defendant's postconviction petition claiming that defense counsel was ineffective for failing to introduce an English translation of the consent-to-search form where only the Spanish version signed by defendant was entered into evidence. Defendant's petition failed to make a substantial showing of a constitutional violation because the allegations in the petition were insufficient to show prejudice occurred. Affirmed.

¶ 2    Defendant, Modesto Alarcon, was convicted of unlawful possession of a controlled substance (over 900 grams of heroin) (720 ILCS 570/401(A)(1)(D) (West 2014)) and money laundering (720 ILCS 5/29B-1 (West 2014)) following a bench trial in the circuit court of Kane County. On direct appeal, we affirmed. *People v. Alarcon*, 2018 IL App (2d) 170325-U

(unpublished order pursuant to Supreme Court Rule 23). On October 31, 2019, defendant petitioned for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)). The trial court advanced the petition to the second stage. The State filed a motion to dismiss the petition, which was granted. Defendant appealed. We affirm.

¶ 3                                  I. BACKGROUND

¶ 4                          A.  Trial Court Proceedings

¶ 5     The allegations in the indictment against defendant stem from an encounter with law enforcement which took place at defendant's home on April 1, 2014. At about 4:25 p.m., law enforcement officers approached defendant in the front yard of his residence. The officers spoke to defendant in both English and Spanish. They did not have a warrant, and they did not have reasonable suspicion sufficient to justify a temporary detention. There was conflicting testimony in the record concerning whether the officers successfully obtained defendant's permission to search his residence. Defendant and the police went into defendant's house. While seated at the dining room table, defendant was given a consent-to-search form written in Spanish. Defendant signed the form. After the form was signed, the police executed a search of the premises. In a detached garage, they discovered approximately seven kilograms of heroin, currency, and a money counter. A handgun was discovered in the basement of the house, as was certain "packing material," such as ziplock bags, a scale, and disposable respirator masks.

¶ 6     Defendant was taken to the police station in Aurora. Prior to waiving his *Miranda* rights, defendant was asked various personal questions, such as his name, his age, and the names of family members. He was also asked about his immigration to this country. An officer then told defendant he wanted to speak with him about the heroin found at his home. Defendant stated that he had seven or eight kilograms of heroin in his garage. Defendant was then read his *Miranda* rights, and

he agreed to speak with the police. He proceeded to make a number of inculpatory statements concerning his possession of the heroin. He also related that he recently picked up over $200,000 in cash and delivered it to another individual. Defendant explained that he was storing the heroin for another individual and that he expected to receive $2000 as payment.

¶ 7 Defendant filed a motion to suppress the evidence seized from his residence arguing the search was an unlawful violation of his fourth amendment rights. An evidentiary hearing commenced on September 8, 2015.

¶ 8 Defendant testified, with the assistance of an interpreter, that Spanish is his first and primary language. He cannot write in English, but he does speak "a little bit" of English. On April 1, 2014, he resided with his wife (he later testified that they are not married, and she is his girlfriend), her children, and her brother. As he parked in front of his home, several police cars pulled up as well. Defendant testified that "the officers wanted to talk to me, to see if they could see inside of the house;" then he and about four officers went inside the house. While inside, the officers asked defendant if he would give them permission to look through his house and he stated that he replied "no." When asked "At anytime [*sic*] did you consent to a search of the house," he replied "no."

¶ 9 On cross-examination, defendant was shown People's Exhibit 1 which was the consent-to-search form written in Spanish. Defendant said he recognized the document, but he did not sign it. Defendant stated that when he spoke with the officers outside his house that day, they "told me that they wanted to talk to me inside the house" and he acquiesced and allowed them into the house. Defendant testified that the female officer was interpreting for him. After being inside for about 10 or 20 minutes, he saw through his living room window that the police began searching his garage. While sitting at a table in his house, the female officer asked him questions and showed

him some documents. Defendant initially admitted that the officer showed him the consent-to-search form, but then stated, "That paper, I didn't—that paper, they didn't have that paper." He then said, "Well, like I said, I saw several papers. I don't remember having seen this paper." When asked, "And the officers [who were] there with the papers that you saw, did they tell you they were asking for a consent to search your house," he replied "yes." However, he said he did not give them consent to search and he never signed the document.

¶ 10    The State called Crystal Williams, who had been an officer with the Department of Homeland Security since 2009. She testified that she is currently assigned to a financial investigations group. She and two other officers arrived at defendant's house in separate cars and approached defendant as he exited his vehicle. Officer Williams said that they began speaking to defendant in English and he seemed to understand, but she repeated some of the questions in Spanish to be sure he understood. Regarding entry into defendant's house, she testified, "We asked him if he minded if we looked around in the house; to search the house, eventually," and "He said yes and indicated that we could, and then took us inside." Upon entering the house, they sat at a dining table, and she showed defendant the consent-to-search form. She acknowledged that she wrote on the form that they wanted to search the house, the detached garage, and the Saturn car. She testified that defendant read the form. Officer Williams also explained the form to him and explained what they wanted to do. She testified that defendant then signed the form, and she and another officer present signed as witnesses. She testified that after defendant signed the form, the search began. No one began searching the house, garage, or Saturn prior to defendant signing the form. Officer Williams testified that defendant never said he had any questions about the form or that he did not understand it. She testified that the form was signed at 4:35 p.m., and they had been in the house for about 10 minutes prior to him signing it.

¶ 11 On cross-examination, Officer Williams testified that she studied Spanish in high school and college. She acknowledged that the handwritten information on the form is written in English. She reiterated that when she spoke to defendant in English, he seemed to understand. However, she spoke to him in Spanish because he speaks Spanish fluently. Officer Williams did not recall whether she read the consent-to-search form out loud to defendant, but she stated that they usually do.

¶ 12 Before stepping down, the trial judge inquired of the witness in reference to the consent-to-search form. He asked Officer Williams whether the words written in English on the form would look much different if written in Spanish. She replied that the reference to the specific car and street address would be essentially the same. In reference to the "detached garage," she noted that "garage" was written in Spanish (garaje) but "detached" was an English word. She explained there is a Spanish word for detached, "You would just say that it's not part of, but I didn't think to write it; but there was only one garage in question."

¶ 13 Damien Cantona, an officer with the Aurora Police Department, was called to testify. On April 1, 2014, he was assigned to a special operations group. He was called to assist with an investigation at defendant's residence. Upon arriving at defendant's residence, he spoke with the officers who were present who told him that they had consent to search the residence. He participated in the search of defendant's residence until sometime after 9 p.m.

¶ 14 Officer Thomas La Pak testified. He is employed by the Village of Hoffman Estates and had been assigned to the financial investigations group of the Department of Homeland Security since 2004. He arrived at defendant's residence in his own unmarked vehicle. He arrived at the same time as Officer Williams and Agent Robert Taylor, who also arrived in their own vehicles. They approached defendant as he was exiting his vehicle. Defendant spoke in English when he

answered questions and explained that he did not have any identification because it was lost in a house fire the year before. When Officer Williams asked defendant if they could go into the house with him, Officer La Pak testified, "He said yes, come inside." Officer La Pak testified that he, Officer Williams, and Agent Taylor were seated at the dining room table with defendant. When shown the consent-to-search form, Officer La Pak testified, "It's our standard consent to search in Spanish." He stated that defendant read the document and that he was "pretty sure" that Officer Williams read it to defendant as well. He saw defendant sign the form and signed it himself as witness. Prior to defendant signing the form, Officer Williams wrote the description of the places to be searched on the form.

¶ 15    On cross-examination, Officer La Pak testified that the conversation that took place while seated at the dining room table was in both Spanish and English. He stated that he brought the consent-to-search form that day and had both the English and Spanish versions. Defendant was asked which he would prefer. Officer La Pak did not tell defendant that he did not have to sign the document or that he had a constitutional right to not sign it.

¶ 16    Agent Robert Taylor of the Department of Homeland Security testified. He stated that he is assigned to the financial investigations group, which investigates bulk cash and drug smuggling. He responded to a call to defendant's residence. He approached defendant with two other officers and engaged in conversation in English. Defendant stated his name, but he explained that he did not have any identification because it was lost in a fire. The officers asked if they could go inside and talk, and defendant replied "yes." They did not ask for consent to search his house at that time. When inside defendant's house, he, Officer Williams, and Officer La Pak sat at a table with defendant and explained the consent-to-search form to him. Agent Taylor observed defendant signing the document. Once the form was signed, the search of defendant's house, garage, and

Saturn car began. No other officers entered defendant's home until the form was signed. Agent Taylor testified that defendant was very cooperative and never indicated that he wanted to withdraw his consent to search.

¶ 17    Lizette Altamirano testified that she is 19 years old and defendant is her father. At the time of this incident, she lived with defendant, her mother, and siblings. She testified that she was in her room when she heard people outside and her sister came to tell her that the police were in the house. She saw defendant and several police officers at the dining room table. She observed a female police officer coming from upstairs with her mother and another sister. Altamirano asked the officer for a search warrant, and the officer told her she did not need one. Altamirano sat down at the table across from defendant. When asked how many officers were in the dining room she said, "There's two and then – there's like a couple, like more than four." She stated that one of the officers left and came back into the house with a document. Altamirano stated that she was translating for defendant as he spoke to police. She testified that she told defendant to not sign the document, and the police officers "moved me to the living room." She did not observe defendant sign the document because several police officers "were surrounding him."

¶ 18    On cross-examination, she testified that the officers, speaking in English, told defendant that he had to sign the form. She told defendant not to sign the form "because he didn't know what he was signing." When asked how she knew he did not know what he was signing, she stated "Because the form was in English, I think." Altamirano admitted that she was not close enough to read the form and she was assuming defendant could not understand it. On redirect, she stated that the primary language spoken in their home is Spanish.

¶ 19    When the hearing reconvened on December 1, 2015, defendant's neighbor, Sammy Sanchez was called to testify. He explained that his and defendant's houses share a driveway

between them. He testified that when he arrived home around 4:15 p.m. on April 1, 2014, there were approximately 10 cars parked on the street and in the driveway. He was approached by two or three police officers who searched him and looked at his driver's license before allowing him to go into his house. He observed "a lot" of officers on defendant's property. Some were going in and out of defendant's house. He testified that some were searching a vehicle.

¶ 20    On cross-examination, Sanchez stated that he was guessing as to what time he arrived home that day, but it was probably around 4:30 p.m. He stated that there were three cars belonging to his family parked in the driveway before he came home that day in addition to the other cars he observed. He stated that he did not see defendant outside his house when he first arrived home, but he did see him outside later, though he could not recall exactly when.

¶ 21    The State recalled Agent Taylor to testify. He stated that once defendant was inside his house with officers, he was not allowed to leave again until he was taken out to be transported to the Aurora police station at approximately 6 p.m.

¶ 22    After hearing arguments, the trial court issued a written order on February 2, 2016, denying the motion to suppress. Thereafter, defendant waived his right to a jury trial. At the bench trial, much of the evidence was presented via stipulation. However, several officers were called to testify as to the items found during the search of defendant's home, detached garage, and Saturn car, which included, a money counter, scales, Ziploc bags, disposable masks, plastic wrap, ammunition, a handgun, $84,000 in cash, and approximately seven kilograms of heroin. Officer Jose Gonzalez, a police officer with the Village of Addison and assigned to the Department of Homeland Security, testified regarding his interview of defendant on April 1, 2014. Gonzalez, whose first language is Spanish, read defendant his *Miranda* rights and witnessed defendant's signing of the *Miranda* rights waiver. During the interview, defendant informed him that, two

days before, he had picked up approximately $200,000 in cash and seven or eight kilograms of heroin. Defendant indicated that he had picked up or delivered illegal drugs and money approximately 10 times, and he was paid for his activity. He would hold the drugs and cash until he received a phone call telling him what to do next.

¶ 23    Defendant was found guilty and sentenced to 60 years' imprisonment.

¶ 24                                    B.  Direct Appeal

¶ 25    Defendant raised three issues on direct appeal.  He argued that the trial court erred in sentencing him to 60 years' imprisonment, in failing to suppress the statements he made during his interview, and in failing to suppress the physical evidence obtained during the search.

¶ 26    Pertinent here is defendant's contention regarding his consent to the search.  On appeal, he argued that the record did not establish that he consented to the search of his house and garage and that a portion of the consent-to-search form he purportedly signed was confusing because it was written in English.  However, we concluded that the evidence presented at trial provided ample evidence of the contents of the form as well as a basis for the trial court to determine that defendant understood sufficient English and the police understood sufficient Spanish such that defendant was meaningfully informed about what he was consenting to.  Most notably, we referenced Officer Williams' testimony (wherein she described conversing with defendant in English and Spanish, presenting the consent-to-search form to defendant, observing defendant reading the form, explaining the form to him, and noting that defendant gave no indication that he did not understand) and Officer La Pak's testimony (wherein he identified the consent formed signed by defendant as "our standard consent to search in Spanish," witnessed the form being explained to defendant, and witnessed defendant signing the form).  Further, we noted:

"[t]hree officers testified that the form was a consent-to-search form. There was evidence in the record that at least one of those officers (Williams) understood Spanish, so she would be able to understand the form. Further, La Pak testified that it was the 'standard' form, so it was the sort of document that the officers would recognize. Under the circumstances, we cannot say that the trial court's findings that Williams presented defendant with a consent-to-search form in Spanish is contrary to the manifest wight of the evidence." *People v. Alarcon,* 2018 IL App (2d) 170325-U, ¶ 40 (unpublished order under Supreme Court Rule 23).

¶ 27  We affirmed the trial court's decision on all issues raised in the direct appeal.

¶ 28                                  C.  Post-Conviction Proceedings

¶ 29  Defendant filed a timely postconviction petition arguing that he received ineffective assistance of counsel because his attorney failed to present the trial court with a translation of the consent-to-search form. He argued that "an adequate investigation by the defense in the case at bar requires the presentation of the verbiage of the crucial document the prosecution relied upon to establish Defendant's consent." Attached to his petition were two pages from the State's appellate brief filed in the direct appeal of this case which purportedly included an English translation of the consent-to-search form generated by Google Translate.[1] Relying on this

_____

[1]In its brief in the direct appeal in this case, the State asked this court to take judicial notice of a translation of the consent-to-search form generated via the online translation program called Google Translate. That translation was incorporated into the State's brief and is now relied upon by defendant to support his contention that the form was confusing. Our decision in the direct appeal did not reference this translation. Instead, we determined that the evidence presented in the

translation, defendant contended that the court was not informed of the "true wording" of this document. He referred to several points in the translation where he contends the words could have been confusing, including two places where the word "registrado" was translated by the program to "registered" or "record" rather than "search." The State moved to dismiss defendant's petition arguing that defendant's claims did not make a substantial showing of a constitutional violation, were waived, or were barred by the doctrine of *res judicata*.

¶ 30   In rendering its decision, the trial court determined that the appellate court was not presented with any ineffective assistance of counsel claims, therefore, the court could not find that issue to be *res judicata* for the purpose of the postconviction petition. However, the court did find the issue regarding the "precise verbiage" of the consent-to-search form could have been raised in the trial court or the appellate court. Because defendant did not raise the issue of the translation of the consent-to-search form in either the appellate or trial court, the trial court deemed the issue waived. Defendant's postconviction petition was dismissed. This timely appeal followed.

¶ 31                                    II. ANALYSIS

¶ 32   Defendant contends that the trial court erred in dismissing his postconviction petition at the second stage of the proceedings.

¶ 33   The Act provides a three-stage process by which criminal defendants may challenge their convictions due to a substantial denial of their constitutional rights. 725 ILCS 5/122-1 *et seq.* (West 2018). A petition brought pursuant to the Act is not a substitute for an appeal but is a

_____

proceedings below provided ample evidence of the content of the form and that defendant was meaningfully informed about what he was consenting to. *Alcaron*, 2018 IL App (2d) 170325-U, ¶ 37.

collateral attack on a final judgment. "Thus, issues raised and decided on direct appeal are barred by *res judicata*, and issues that could have been raised but were not are forfeited." *People v. Tate*, 2012 IL 112214, ¶ 8. If, as here, a petition is not dismissed as frivolous or patently without merit at the first stage, it proceeds to the second stage. *Tate*, 2012 IL 112214, ¶ 8. At the second stage, the State may either answer or move to dismiss the petition. The trial court then determines if the petition and any accompanying documentation make a substantial showing of a constitutional violation. *People v. Turner*, 2012 IL App (2d) 100819, ¶ 19. If the allegations in the petition, supported by the record and accompanying affidavits, demonstrate a substantial violation of a constitutional right, the petition proceeds to the third-stage evidentiary hearing. *Tate*, 2012 IL 112214, ¶ 10. When, as in this case, the court dismisses a petition at the second stage without an evidentiary hearing, we review the matter *de novo*. *Turner,* 2012 IL App (2d) 100819, ¶ 21.

¶ 34    We first address whether defendant's claim was forfeited or barred by principles of *res judicata*. While the determination regarding defendant's consent to the search was previously decided at the trial court level and affirmed by this court on direct appeal, defendant's claim regarding the "precise verbiage" of the consent-to-search document, or more specifically, his trial counsel's failure to seek admission into evidence of an English translation of that document, relates directly to his fundamental contention that he was deprived of effective assistance of counsel. Because the issue before us, defendant's ineffective assistance of counsel claim, was not previously raised, it is not foreclosed by *res judicata*. We further find the issue is not forfeited. Ordinarily, the failure to raise a claim of ineffectiveness of trial counsel in the direct appeal renders the issue forfeited in subsequent postconviction proceedings. *People v. Daniels*, 301 Ill. App. 3d 87, 987 (1998). In this case, defendant acknowledges that he did not raise this issue in his direct appeal, but he argues that his claim cannot be considered forfeited because he "could not raise an

argument involving the translation where the translation was not part of the record on appeal." "Where facts relating to the competency of counsel are not in the record or are newly discovered, the [forfeiture] rule is relaxed." *People v. Steidl,* 177 Ill. 2d 239, 251 (1997). Under the circumstances, we will consider the merits of defendant's claim.

¶ 35    Defendant contends that he made a substantial showing that his trial counsel was ineffective. He contends that his trial counsel should have sought admission of an English translation of the consent-to-search form to show that the form, itself, was confusing to defendant such that he did not knowingly consent. He argues that his trial counsel's failure to do so resulted in the denial of his motion to suppress the evidence. In his brief, defendant spends a great deal of time commenting on the trial court's ruling, specifically contending that the trial court made an inappropriate factual finding that defendant stated that he knew the police were asking to search his residence and garage and that the trial court inappropriately assessed the credibility of defendant and the police officers regarding what the consent-to-search form stated. However, defendant's assessment of the trial court's reasoning is not controlling here as our review in this case is *de novo*.

¶ 36    In evaluating defendant's claim of ineffective assistance of counsel, we are guided by the standard set forth in *Strickland v. Washington,* 466 U.S. 668 (1984). To demonstrate ineffective assistance of trial counsel, the defendant must allege facts showing that counsel's performance fell below an objective standard of reasonableness and resulted in prejudice to the defendant. *Strickland*, 466 U.S. at 687. Under the first prong, an attorney has a duty to conduct both factual and legal investigations on behalf of his or her client in accordance with prevailing processional norms. *People v. Brown,* 2015 IL App. (1st) 122940, ¶ 48. To establish prejudice, a defendant must show that but for counsel's deficiency, there is a "reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Because a defendant must satisfy both prongs of the test to prevail, the failure to establish either precludes a finding of ineffective assistance.

¶ 37    "The 'substantial showing' of a constitutional violation that must be made at the second stage is a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, which if proven at an evidentiary hearing, would entitle petitioner to relief." *People v. Domagala*, 2013 IL 113688, ¶ 35. Evidentiary questions are not to be resolved at this stage, however, only those facts that are well-pled and not positively rebutted by the original trial record are to be taken as true. *People v. Coleman,* 183 Ill. 2d 366, 385 (1998). After careful review, we determine that the petition in this case fails to allege sufficient facts demonstrating a substantial showing as to the second prong (prejudice prong) of the *Strickland* test.

¶ 38    Defendant's contention that the language of the consent-to-search form was confusing or unclear and that his counsel's failure to offer a translation of the form resulted in prejudice is positively rebutted by the record in this case. Three officers testified that the consent-to-search form signed by defendant was a "standard" consent form in Spanish. Officer Williams spoke to defendant in English and Spanish, explained the form to him in Spanish, and witnessed him signing the form. Defendant gave no indication that he did not understand the form. Officer La Pak witnessed defendant review and sign the form. Agent Taylor testified that he observed the form being explained to defendant and observed defendant sign the form. When being questioned about the form, defendant denied signing it, but on numerous occasions he stated that he knew the officers wanted to search his residence.

¶ 39    In our decision in the direct appeal, we commented on the fact that there was no translation of the consent-to-search form in the record. We held:

"In any event, the evidence presented in the proceedings below provided ample evidence of the content of the form. It also provided a basis for the trial court to determine that defendant understood sufficient English and the police understood sufficient Spanish such that defendant was meaningfully informed about what he was consenting to." *Alarcon,* 2018 IL App (3d) 170325-U, ¶ 37.

¶ 40 During the second stage of postconviction proceedings, the circuit court is concerned with determining whether the petitioner's allegations sufficiently show a constitutional infirmity that would necessitate relief under the Act. *People v. Coleman*, 183 Ill. 2d 366, 380 (1998). We conclude that defendant's allegations fail to do so in this case. Defendant's petition fails the second prong of the *Strickland* test by failing to allege sufficient facts to demonstrate that the outcome of the trial would have been any different had an English translation of the consent to search form been offered into evidence. Accordingly, we affirm the dismissal of his postconviction petition.

¶ 41                                   III. CONCLUSION

¶ 42 For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 43 Affirmed.